**TRIBUNE COMPANY, Appellant**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee**

Nos. 97–1228, 97–1229.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1997.

Decided Jan. 16, 1998.

---

Carter G. Phillips, Washington, DC, argued the cause for appellant, with whom Mark D. Schneider, Washington, DC, Katherine L. Adams, New York City, Gary D. Mitchell, and Charles J. Sennet, Chicago, IL, were on the briefs.

Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, Washington, DC, argued the cause for appellee, with whom William E. Kennard, General Counsel at the time the brief was filed, and C. Grey Pash, Jr., Washington, DC, Counsel, were on the brief.

John F. Sturm, Oklahoma City, OK, Richard E. Wiley, James R. Bayes, Washington, DC, James J. Popham, Washington, DC, Henry L. Baumann, and Jack N. Goodman were on the brief for amici curiae Association of Local Television Stations, Inc., et al.

Before: SILBERMAN, SENTELLE, and GARLAND, Circuit Judges.

**64**

SILBERMAN, Circuit Judge:

Appellant challenges the Federal Communications Commission's refusal to grant it a permanent waiver, or at least a temporary waiver pending the outcome of future rulemaking, of its daily newspaper cross-ownership rule. We affirm.

## I.

Tribune Company, which publishes the *Sun–Sentinel* newspaper in Fort Lauderdale, Florida, agreed to merge with Renaissance Communications Corporation, the owner of six television station licenses, including WDZL(TV) in Miami, Florida,[1] subject to the FCC's approval of the transfer of those licenses to Tribune. The Commission, however, determined that WDZL's Grade A contour[2] encompassed the entire Fort Lauderdale community; therefore, WDZL and the *Sun–Sentinel* were in the same primary market, and the daily newspaper cross-ownership rule prohibited their common ownership. The Commission nevertheless granted Tribune a temporary waiver of its rule, which allowed Tribune to take possession of the WDZL station license (the merger was consummated on March 25, 1997). But it required that Tribune divest itself of that license or the *Sun–Sentinel* before March 22, 1998, one year from the date of the FCC's order.

The relevant portion of the Commission's daily newspaper cross-ownership rule provides that "[n]o license for [a] ... TV broadcast station shall be granted to any party ... if such party directly or indirectly owns, operates or controls a daily newspaper and the grant of such license will result in [t]he Grade A contour of a TV station ... encompassing the entire community in which such newspaper is published." 47 C.F.R. § 73.3555(d)(3) (1996). The Commission has explained that its rule rests on the twin goals of promoting viewpoint diversity and economic competition. *See* Multiple Ownership

of Standard, FM, and Television Broadcast Stations, Second Report and Order, 50 F.C.C.2d 1046, 1074 (1975). Its constitutionality was unanimously upheld by the Supreme Court in *FCC v. National Citizens Committee for Broadcasting* (*NCCB*), 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978). The Court observed that under the Act's public interest standard, *see* 47 U.S.C. §§ 303, 309(a) (1994), it was well within the Commission's domain to pursue "the First Amendment goal of achieving 'the widest possible dissemination of information from diverse and antagonistic sources.'" *NCCB*, 436 U.S. at 795, 98 S.Ct. at 2112 (quoting *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945)). It held that in light of the "physical scarcity," *id.* at 799, 98 S.Ct. at 2114, of the broadcast spectrum, the rule did not violate the First Amendment rights of newspaper owners because "there is no 'unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.'" *Id.* (citing *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 388, 89 S.Ct. 1794, 1805–06, 23 L.Ed.2d 371 (1969)). Nor did it matter that the administrative record before the Commission did not conclusively establish that the rule would in fact increase viewpoint diversity in the local communications market; the agency's predictive judgment was enough because it was based on its expert knowledge. *NCCB*, 436 U.S. at 796–97, 98 S.Ct. at 2112–13.

Tribune acknowledged that the FCC's cross-ownership rule would prohibit it from owning both media outlets. But it argued before the Commission that the South Florida mass media market, encompassing Dade (Miami), Broward (Ft. Lauderdale), and Palm Beach counties, was sufficiently diverse and competitive so as to obviate any need to apply the rule in this case. Tribune identified 23 separately owned television stations, 69 radio stations operated by 49 different

---

1. The other stations are: KTXL(TV), Sacramento, CA; WTIC–TV, Hartford, CT; WXIN(TV), Indianapolis, IN; WPMT(TV), York, PA; and KDAF(TV), Dallas, TX.

2. Grade A contour is a measure of signal field strength. The Commission has said that the

boundary of the Grade A contour is set where a good picture may be expected to be available for at least 90% of the time at the best 70% of receiver locations. *See Clarksburg Publ'g Co. v. FCC,* 225 F.2d 511, 516 n. 12 (D.C.Cir.1955).

owners, 7 daily newspapers published by 6 different owners, 15 weekly community newspapers, and in excess of 250 magazines, specialty publications, and consumer journals all serving the South Florida market. It counted 35 cable systems providing an average of 62 channels of programming in the market, and claimed that cable television subscription rates in each county was above 60%. It showed that approximately 85% of all households owned a VCR; it also speculated that many had access to the Internet. And, in light of certain advertising, subscription, and audience share data, it argued that the rule clearly was not needed to encourage economic competition. Tribune claimed that the public would be disserved by strict enforcement of the rule, because it could exploit synergies arising from the common ownership of both print and broadcast news departments to enhance programming so as to compete more effectively with other South Florida news programs. For these reasons, Tribune sought a permanent waiver of the rule.

The Commission was unpersuaded. Its established waiver policy, set forth in the FCC's 1975 Second Report and Order, provides in relevant part that the Commission will consider waiving the rule "where, for whatever reason, the purposes of the rule would be disserved by divestiture." *In re Applications of Stockholders of Renaissance Communications Corp. and Tribune Co. (Renaissance Communications)*, FCC97–98, 1997 WL 131036 at ¶ 34 (Mar. 21, 1997). As broad as this language may appear, the Commission has consistently interpreted it to allow for waiver only in "exceptional circumstances." *Metropolitan Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1163 (D.C.Cir.1995). A permanent waiver of the rule has been granted only twice. In both instances, the beneficiary was permitted to reacquire a media outlet in financial distress; in effect, the Commission granted waivers to permit a rescue.[3] According to the FCC, Tribune failed to show the sort of extraordinary circumstances that would meet this test. Even if Tribune were correct in asserting there were a number of competing media

voices in the South Florida market, the FCC believed its primary concern of ensuring diverse viewpoints from antagonistic sources was unaffected. The Commission thought Tribune's economic competition evidence similarly unexceptional. And, the public benefits Tribune promised were hardly unique; they would exist in virtually all like combinations. If a waiver were granted on that basis, the rule would be meaningless.

The Commission determined that to the extent Tribune called into question the validity of the rule itself or the FCC's waiver policy, its arguments should be addressed in the broader context of a rulemaking; they were inappropriate in a restricted licensing proceeding. Presumably anticipating this response, appellant asked, in the alternative, that it be granted, in effect, a temporary waiver until such time as the Commission completed a rulemaking proceeding to review its cross-ownership rule or its waiver policy in light of the changes Tribune identified (which would have extended for a longer period than the temporary waiver it was ultimately granted). The FCC declined, apparently because it thought such action would be inconsistent with prior practice and because Knight–Ridder, Inc., publisher of the *Miami Herald* (which competes with the *Sun–Sentinel*), was opposed. *See Renaissance Communications* at ¶¶ 56 n.50, 57.

In response to appellant's claim that the cross-ownership rule was unconstitutional as applied to Tribune, the FCC pointed to *NCCB* and the viewpoint diversity rationale that case endorsed. Tribune implored the FCC to consider whether the scarcity rationale underlying that decision was still valid in light of the proliferation of media sources, but the Commission declined, noting that "nothing in the subsequent decisions of the courts" suggested that the rule was unconstitutional. *Renaissance Communications* at ¶ 51. We agreed to hear Tribune's appeal on an expedited basis so that Tribune would have time to effect an orderly divestiture in the event of an adverse decision.

---

3. The Commission explained that even temporary waivers of the kind Tribune received are granted in "relatively rare circumstances." *Renaissance Communications* at ¶ 44 n.34.

## II.

■ The Commission's primary objections to appellant's case are jurisdictional. The Commission contends that because the Communications Act only allows applicants whose license·transfer application is *denied* to appeal one of its orders in our court, 47 U.S.C. § 402(b)(3) (1994), and it *granted* Tribune's application (albeit subject to condition), we must dismiss Tribune's appeal. Even were we to determine that that section is not a bar to the appeal, Tribune, the Commission also argues, failed to comply with the FCC's administrative exhaustion requirement set forth in its rules. *See* 47 C.F.R. § 1.110 (1996).

We start with the statute. In *Mobile Communications Corporation of America v. FCC,* 77 F.3d 1399 (D.C.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 81, 136 L.Ed.2d 38 (1996), we decided that when the Commission grants an application subject to some condition which the applicant did not request, the application has been denied for purposes of § 402(b). In that case, the applicant, Mtel, had sought a license that would have been awarded without charge under then-applicable law. Before the FCC ruled on Mtel's application, Congress amended the Communications Act to require that successful applicants pay for their licenses, so the Commission imposed a charge. We said that Mtel's application was properly viewed as being for a *free* license rather than a license subject to any condition. By awarding a license subject to a condition of payment, the FCC in effect denied that application.

■ The Commission would have us limit *Mobile Communications* to those instances where there has been a change in law while an application is pending, but we do not see why that is a principled distinction. We were concerned generally that by "interpreting an application as one for a license subject to any condition of the Commission's choos-

ing [we] would permit the Commission to foreclose judicial review of a de facto denial by couching its decision as an approval subject to some intolerable condition." *Mobile Communications,* 77 F.3d at 1404. Here, Tribune sought to acquire control of the WDZL license while being allowed to retain ownership of its *Sun–Sentinel* newspaper on a permanent basis. The Commission's order does not permit it to do so. Tribune may hold both assets temporarily, but must divest itself of one of its media outlets before March 22, 1998. Therefore, Tribune's application was denied for purposes of § 402(b)(3).[4]

■ Turning to the more troublesome exhaustion argument, the Commission's rule provides, in pertinent part:

> Where the Commission without a hearing grants any application in part, or with any privileges, terms, or conditions other than those requested ... the action ... shall be considered as a grant of such application unless the applicant shall ... reject[ ] the grant as made. [Where the applicant seeks reconsideration], the Commission will vacate its original action ... and set the application for hearing .... .

47 C.F.R. § 1.110 (1996). We have squarely held that "[t]he plain language of § 1.110 implies an exhaustion requirement" that "does not allow applicants first to accept a partial grant, yet later to seek reconsideration of its conditions." *Central Television, Inc. v. FCC,* 834 F.2d 186, 190 (D.C.Cir.1987).

Tribune contends, drawing on the logic of *Mobile Communications'* holding, that § 1.110 is not applicable because its application was really *denied.* But § 1.110, unlike § 402(b), is written to specifically deal with a conditional grant and it could not be clearer that it covers the present case. Just because a partial grant is a denial for purposes of § 402(b)(3) does not mean that the same reasoning applies to § 1.110. Indeed, we said

---

4. Tribune comes before us as both appellant and petitioner, having appealed the Commission's order in case No. 97–1228 pursuant to § 402(b), and having petitioned for review of that order in case No. 97–1229 pursuant to 47 U.S.C. § 402(a). As we have said before, "the provisions for judicial review contained in §§ 402(a) and 402(b) are mutually exclusive," *Friedman v. FCC,* 263 F.2d 493, 494 (D.C.Cir.1959), so that a

claim directed to the same matters may be brought only under one of the two provisions. *See Freeman Eng'g Assocs. v. FCC,* 103 F.3d 169, 177 (D.C.Cir.1997). Having decided that *Mobile Communications* establishes that § 402(b)(3) is the proper avenue of review when the Commission grants an application subject to an unasked for condition, we dismiss the petition in No. 97–1229.

in *Mobile Communications,* 77 F.3d at 1404, that "a party whose license application has been denied by approval subject to conditions (other than ones requested by the applicant) must normally comply" with § 1.110. Requiring a party who wishes to protest a conditional grant to seek rehearing before the Commission does not jeopardize that applicant's rights to appeal as did the Commission's pre-*Mobile Communications* construction of § 402(b)(3).

Tribune also argues that it would have been futile for it to have sought reconsideration in this case. We have recognized that § 1.110 does not bar review where appellant can show futility, *Central Television,* 834 F.2d at 191 n. 11, although we have also cautioned that "[f]utility should not lightly be presumed." *Washington Ass'n for Television and Children v. FCC,* 712 F.2d 677, 682 n. 9 (D.C.Cir.1983). In *Mobile Communications,* 77 F.3d at 1404, we said that the basic reason for § 1.110's exhaustion requirement was to protect "the Commission's interest in crystallizing its position prior to review." Of course it follows that reconsideration would be of no purpose if the Commission's position is already "crystallized." That conclusion is in accord with our decisions in *Omnipoint Corporation v. FCC,* 78 F.3d 620, 635 (D.C.Cir.1996), where we held that it would have been futile to raise an issue on rehearing under §.405 of the Communications Act where the FCC was "wedded" to its procedures and *Chadmoore Communications, Inc. v. FCC,* 113 F.3d 235, 239–40 (D.C.Cir.1997), where we seemed to suggest that reconsideration under that same section was futile because the Commission was firmly entrenched in its position (one judge disagreed on the facts, but did not challenge the principle).

On the other hand, in *Action for Children's Television v. FCC,* 564 F.2d 458, 469 (D.C.Cir.1977) (the case upon which we relied in *Central Television* in establishing that § 1.110 contains a futility exception), we said that reconsideration would not be futile if a novel factual issue exists, or if an agency's views on a particular legal issue had not generally been made known. We thought the same thing in *Noel Foods v. NLRB,* 82 F.3d 1113, 1121 (D.C.Cir.1996), where the NLRB "betrayed no awareness" of an issue in its decision. In short, we think that *Mobile Communications* sums it up well; to show that reconsideration would have been futile, an appellant must show that the Commission. has left no doubt about its position. It was suggested (but only at oral argument) that the exhaustion requirement, because it provides for a hearing before an ALJ, should be limited to those cases in which there is a factual dispute. Yet the Commission does not interpret its regulation in that manner and we see no reason why it should. It may not be apparent when an applicant wishes to challenge a condition whether factual evidence is needed or not. And even if only legal or policy arguments are presented, it surely is not inappropriate for the Commission to insist that the arguments be presented first to an ALJ, who would then present to the Commission a recommended decision. Accordingly, we are obliged to examine appellant's arguments and the Commission's treatment of them, both in this case and others, to determine whether it would have been futile for Tribune to have complied with the Commission's administrative exhaustion requirement. We must determine whether the FCC has taken a hard and fast position, or whether appellant had a decent chance of convincing the FCC on rehearing. Paradoxically, the more persuasive appellant's argument, the worse off it may be with respect to exhaustion.[5]

### III.

Tribune essentially makes two arguments. It argues (with the support of *amici* Newspaper Association of America, Association of Local Television Stations, and National Association of Broadcasters) that the "factual and legal foundations" supporting the daily newspaper cross-ownership rule have been irreparably shaken by the dramatic changes in the

---

5. The Commission's counsel suggests that appellant's failure to comply with § 1.110 prevents us from reviewing *any* of Tribune's claims. But we think that if it would have been futile for Tribune to have sought reconsideration of any particular claim, that claim may be severed from the rest and heard.

media marketplace over the last two decades. Since there has been a proliferation of media outlets, it can no longer be said that those outlets are scarce, and therefore the rule should no longer be applied to applicants, or at least not Tribune. Tribune alternatively claims that the Commission arbitrarily denied Tribune a procedural alternative—a longer temporary waiver—that it had recently offered· to a similarly situated applicant. We think that it would have been useless for Tribune to seek reconsideration of the former, but not the latter of those arguments.

\* \* \* \*

■ Tribune presents its dispute with the cross-ownership rule in three different forms: as a challenge to the rule, as a challenge to the Commission's waiver policy, and as an "as applied" challenge. But whichever way the argument is made, the Commission clearly and repeatedly demonstrated that it would apply its rule, as upheld by the Supreme Court in *NCCB*, in this adjudicatory license transfer proceeding; if the rule is to be reconsidered, it must be in a rulemaking proceeding. *Renaissance Communications* at ¶¶ 50, 51. It can hardly be said that Tribune had a realistic chance to convince the FCC otherwise on rehearing, and reconsideration, then, would have been futile. We therefore consider each variation of Tribune's argument.

■ First, it is claimed that the Commission is obliged to reconsider its cross-ownership rule or at least to not apply it in this case. The Commission, as we noted, refused to do so in the context of an adjudicatory licensing proceeding. Tribune (perhaps because of time constraints imposed by the merger) did not ask the Commission to initiate a new rulemaking procedure, so it can hardly appeal the Commission's refusal to do so. And it is hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding. *See* P. STRAUSS, ET AL., GELLHORN AND BYSE'S ADMINISTRATIVE LAW 657 (9th ed.1995) (agency is bound by its substantive rules unless validly amended or rescinded); *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C.Cir.1982) (APA contemplates that a substantive rule would be amended or repealed by rulemaking under APA).

We have suggested (in dicta) that where an agency is confronted with an undisputable indication that its rule is illegal, either because of the reasoning of a Supreme Court decision or intervening legislation, it may be entitled, indeed obliged, to decline to apply it. *American Tel. & Tel. Co. v. FCC (AT&T)*, 978 F.2d 727, 733 (D.C.Cir.1992).[6] Appellant would have us treat its claim as coming within the *AT&T* exception because the legality—the constitutionality—of the cross-ownership rule was based on the scarcity doctrine, and the Supreme Court has obliquely suggested it might reconsider that doctrine on the FCC's "signal . . . that technological developments have advanced so far that some revision of the system of broadcast regulation may be required." *FCC v. League of Women Voters*, 468 U.S. 364, 376–77 n. 11, 104 S.Ct. 3106, 3115–16 n. 11, 82 L.Ed.2d 278 (1984). That *possibility* is simply not in the same ballpark as a clear manifestation that the rule, without any further inquiry, is illegal. It may well be that faced with a rulemaking petition the FCC would be thought arbitrary and capricious if it refused to reconsider its rule in light of persuasive evidence that the scarcity rationale is no longer tenable. *See American Horse Protection Ass'n v. Lyng*, 812 F.2d 1 (D.C.Cir.1987); *WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C.Cir. 1981); *Geller v. FCC*, 610 F.2d 973 (D.C.Cir. 1979) (per curiam).[7] And the Supreme Court's suggestion that it might reconsider the scarcity doctrine on the FCC's "signal" in *League of Women Voters* may impose an implicit obligation on the Commission. Con-

---

**6.** We suggested in that unusual event the agency would presumably issue a notice of proposed revocation of the rule—which would essentially go into effect immediately.

**7.** The scarcity doctrine has been the subject of "intense criticism," *see, e.g., Time Warner Entertainment Co. v. FCC*, 105 F.3d 723, 724 (D.C.Cir. 1997) (Williams, J., dissenting from denial of rehearing *en banc*); many have questioned its continuing validity.

gress, since 1987, expressly forbad the Commission (in appropriations legislation) from reconsidering its daily newspaper cross-ownership rule, but it has now directed the FCC to review *all* of its media ownership rules, including the one in question, at least biennially. *See* Telecommunications Act of 1996, Pub.L. No 104–104, § 202(h), 110 Stat. 56, 111–12 (1996). Still, whether the Commission is obliged to reconsider its rule can be raised to this court only on review of a Commission denial of a rulemaking petition.

█ Appellant's next formulation is that the Commission was obligated to reconsider its *waiver policy* in the licensing proceeding. Appellant relies on two of our prior cases, *Meredith Corporation v. FCC*, 809 F.2d 863 (D.C.Cir.1987), and *Bechtel v. FCC*, 957 F.2d 873 (D.C.Cir.1992), in which we held that an FCC *policy* could be challenged in an adjudicatory or license proceeding. Appellant's difficulty is that its claim and supporting evidence calls into question not just the FCC's waiver policy, but the continuing validity of an underlying rationale justifying the cross-ownership rule itself—the scarcity doctrine. As the Commission points out, if the FCC were to grant waivers on the grounds appellant suggests, virtually all like combinations would also be entitled to a waiver, and nothing would remain of the rule. Changes in the media marketplace are not unique to South Florida. Neither of the cases appellant relies upon involved an implicit attack on a rule adopted under the APA.

█ Finally, Tribune argues that the rule, *as applied* to Tribune, is unconstitutional. But the so-called "as applied" challenge is, like appellant's challenge to the FCC's waiver policy, really no different than a challenge to the rule. It is as apparent to us as it was to the Commission that Tribune is not presenting a unique "as applied" case. Again, the evidence Tribune presents is not particular to the South Florida market; most, if not all, of the country's media markets have experienced similar growth. In any event, in upholding the rule in *NCCB*,

the Supreme Court did so by relying, in part, on the Commission's predictive judgment, based on experience, that it was unrealistic to expect diversity from commonly owned entities. The Commission apparently is still wedded to that judgment, *see Renaissance Communications* at ¶¶ 47, 51, and nothing in the subsequent decisions of the Court have called the constitutional validity of that judgment into question. Nor are we free to "reexamine the scarcity doctrine in this case on this record," as Tribune asks. The Supreme Court has told the lower federal courts in no uncertain terms that we are to leave the overruling of its opinions to the Court itself. *See State Oil Co. v. Khan,* —— *U.S.* ——, ——, 118 S.Ct. 275, 284, 139 L.Ed.2d 199 (1997); *see also United States v. $639,558,* 955 F.2d 712, 718 (D.C.Cir.1992). We are stuck with the scarcity doctrine until the day that the Supreme Court tells us that the *Red Lion* no longer rules the broadcast jungle.

\* \* \* \*

█ Tribune's second main argument, that the Commission behaved in an arbitrary and capricious manner by not staying the running of the divestiture period until a rulemaking to review the daily newspaper cross-ownership rule was completed, is its most compelling.[8] Two Commissioners in fact endorsed this course of action in separate statements. As Tribune points out, the Commission previously followed a closely analogous course of action in *In re Applications of Capital Cities/ABC, Inc., and the Walt Disney Company,* 11 F.C.C.R. 5841 (1996). In that case, the FCC approved the transfer of a radio license to a company that owned a newspaper in the same primary market, subject to an order to divest one of the assets within a year. Appellant is, of course, subject to the same condition. Yet in *Capital Cities,* the Commission at the same time began a review of its daily newspaper/radio cross-ownership waiver policy. *See id.* at 5851; *see also In the Matter of Newspaper/Radio Cross–Ownership Waiver Policy,*

---

**8.** We note that Tribune devoted only one paragraph in a 58 page brief to making this argument, which barely survives our requirement that a parties' arguments be sufficiently developed lest waived.

11 F.C.C.R. 13003 (1996) (notice of inquiry seeking comment on that policy). When it became clear that the proceeding to reexamine the waiver policy would not be completed until after the 12 month period had expired, the Commission granted Disney's request to defer the divestiture date until six months from the issuance of the effective date of the FCC's action in that proceeding. The Commission apparently denied Tribune's request for what would be in effect a temporary waiver pending the outcome of a rulemaking concerning its daily newspaper/television cross-ownership rule in this case because such course of action would be somehow inconsistent with prior practice, *Renaissance Communications* at ¶ 57, and because Knight–Ridder, Tribune's competitor, opposed it. *Id.* at ¶ 56 n. 50.

Unfortunately for appellant, we are foreclosed from considering its claim that the Commission's inconsistent treatment of the two cases reflects arbitrary and capricious decisionmaking, because we do not think that reconsideration of this specific challenge would have been futile. The Commission's answer as to why it granted a temporary waiver pending the completion of a rulemaking in *Capital Cities,* but did not in Tribune's case, seems inexplicable. We agree with appellant that the Commission "essentially ignored" this portion of Tribune's argument. We can only speculate why the Commission did not give this issue the care it deserved. It appears that before the FCC, as before us, Tribune did not make this claim its focus; Tribune directs us to only three pages of its approximately 400 page application to show that it made the argument before the Commission. Had Tribune sought reconsideration, the Commission's attention surely would have been squarely drawn to the issue. We thus, given the logic of appellant's argument and the FCC's inadequate response, do not see how we can conclude that reconsideration would have been futile.

We are not unsympathetic to Tribune's position. *Amici* filed a petition for rulemaking seeking repeal of the daily newspaper cross-ownership rule (after the Commission's order in the Tribune proceeding). The government's counsel told us at oral argument that the Commission plans, pursuant to the requirement imposed by the Telecommunications Act of 1996, to review its cross-ownership rule in the near future. But the Commission subsequently informed us that it does not expect a review to begin until the summer or the fall of 1998. It seems a shame for Tribune not to be given the same relief as Disney in *Capital Cities.* Still, Tribune could have protected itself by seeking reconsideration. Or, had it filed a petition for rulemaking at the same time that it filed its transfer application, the Commission might have been more willing to consider Tribune's temporary waiver alternative. Tribune did not pursue either option, perhaps because, as the Commission suggests, to challenge the FCC's original decision would have jeopardized its merger agreement with Renaissance. Whatever Tribune's reason may have been, the Commission is entitled to preserve the "finality of its decisions." *Central Television,* 834 F.2d at 190–91.

\* \* \* \*

The Commission's order is affirmed. Tribune's petition for review in No. 97–1229 is denied, and the portion of its appeal for which reconsideration would not have been futile is dismissed for want of jurisdiction.

*So ordered.*