# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 17, 2014         Decided September 2, 2014

No. 13-1215

SORENSON COMMUNICATIONS, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order of
the Federal Communications Commission

*Christopher J. Wright* argued the cause for petitioner. With him on the briefs were *John T. Nakahata* and *Mark D. Davis*. *Timothy J. Simeone* entered an appearance.

*C. Grey Pash Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice; *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys; *Jonathan B. Sallet*, Acting General Counsel, Federal Communications Commission; and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission, entered an appearance.

*Roy T. Englert Jr.* was on the brief for *amicus curiae* National Association of the Deaf in support of petitioner.

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: When a hearing- or speech-impaired person wants to make a phone call, he can choose among several services that will assist him in doing so. One of these, video relay service (VRS), works much like a video call that any caller might make using a digital platform such as Skype or Apple FaceTime. The video call is placed to an American Sign Language interpreter, employed by the VRS provider, who then makes a standard voice call to the video caller's hearing recipient. The interpreter signs with the caller via the visual connection and speaks with the recipient via the voice connection, translating messages back and forth.

The petitioner, Sorenson Communications, Inc., has been the leading provider of VRS since the service began to gain popularity about ten years ago. Like all providers of VRS, Sorenson is paid by the minute at a rate set by the Federal Communications Commission and paid by the Commission from the Telecommunications Relay Services Fund. The per-minute rate is supposed to approximate the cost incurred to provide VRS, but in fact for much of the past decade the rate has generated revenues well in excess of that cost. In order more accurately to reflect cost until it could develop a new approach to reimbursement, therefore, the Commission lowered the per-minute rates first in its 2010 Rate Order and again in its 2013 Rate Order, the latter of which is the subject

of Sorenson's petition for review. Having incurred costs under the pre-2010 rates that cannot be sustained under the new rates, Sorenson complains that the new rates are too low and, additionally, that the decremental rates it receives for minutes in excess of 500,000 and of 1,000,000 unreasonably favor its smaller, allegedly less efficient competitors.

Sorenson challenges the 2013 Rate Order as arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(a), but its challenge is problematic for two principal reasons. First, it made nearly the same challenge to the 2010 Rate Order and lost in the Tenth Circuit. Second, in suggesting the Commission should be required to compensate providers for certain additional costs, Sorenson largely fails to demonstrate (or even to make a threshold showing) that the costs are necessary to the provision of VRS; it instead emphasizes that it did in fact incur those costs, discretionary though they may be. Because the 2013 Rate Order is not arbitrary and capricious for ignoring costs incurred unnecessarily, even when the consequence for the provider that incurred those costs might be ruinous, we find no fault with the new rates.

In one respect, however, Sorenson has demonstrated that additional consideration by the Commission is necessary: Providing service under the more demanding speed-of-answer requirement that the agency adopted as part of the 2013 Rate Order likely entails additional labor costs, a prospect nowhere addressed in the Order. We therefore vacate the new speed-of-answer requirement and remand that portion of the Order to the Commission to decide whether that requirement of improved service justifies increasing the rate of compensation concomitantly.

As for the tiered rates, we hold the Commission adequately justified the 500,000- and 1,000,000-minute cut-offs. As the agency explained, it was pursuing two goals – setting rates to reflect economies of scale and transitioning the industry from rate regulation to competitive bidding. Because the task of balancing those goals is fairly within the discretion of the agency, we defer to its decision concerning the tiered-rate structure.

## I. Background

Title IV of the Americans with Disabilities Act of 1990 (ADA) requires the Commission to make available telecommunications relay services (TRS), of which VRS is one, so that individuals with hearing or speech disabilities may have telephone service that is "functionally equivalent" to the voice system used by hearing individuals. 47 U.S.C. § 225. VRS users receive the enhanced service free of charge and the Commission compensates providers from the TRS Fund, which is financed by a tax the agency levies on the revenues of interstate telecommunications services. § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii). The statute directs the Commission to set compensation rates and functional requirements for providers in order to

  (1) "ensure that [TRS is] available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals," § 225(b)(1);

  (2) "require that users of [TRS] pay rates no greater than the rates paid for functionally equivalent voice communication services with respect to such factors as the duration of the call, the time of day, and the distance from point of origination to point of termination," § 225(d)(1)(D); and

(3) "not discourage or impair the development of improved technology." § 225(d)(2).

When the FCC first recognized VRS as a form of TRS eligible for reimbursement, *see In re Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Report & Order, 15 FCC Rcd. 5140, 5152-54, ¶¶ 21-27 (2000), video calling was "a specialized, niche market requiring customized hardware and software, as well as frequently unavailable broadband Internet access service." *In re Structure & Practices of the Video Relay Serv. Program, Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17367, 17380, ¶ 19 (2011) [hereinafter *2011 Notice*]. As video calling has proliferated generally, so has VRS; callers now use over 10 million minutes of the service per month. *See Interstate TRS Fund Performance Status Report*, Rolka Loube Saltzer Associates (TRS Fund Administrator) (June 2014), http://www.r-l-s-a.com/TRS/reports/2014-06TRSStatus.pdf (last visited August 25, 2014). Despite video calling having become "a mainstream, mass-market offering," *2011 Notice* at ¶ 19, the market for VRS is highly concentrated and has become only more so in recent years: Sorenson provides about 80% of the VRS minutes logged every month, and its two principal competitors each provide another five to ten percent.

From the inception of VRS until 2007, the Commission annually set compensation rates based upon the average of all VRS providers' projected costs, as reported to a fund Administrator appointed by the agency. *See In re Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Report & Order, 19 FCC Rcd. 12475, 12487-90, ¶¶ 17-24 (2004) [hereinafter *2004 R&O*].

During this period, the Commission developed a list of compensable costs that has consistently included, for example, directly attributable overhead, labor costs, executive compensation, and an 11.25% rate of return on investment. *Telecomms. Relay Servs. & Speech–to–Speech Servs. for Individuals with Hearing & Speech Disabilities*, Report & Order & Declaratory Ruling, 22 FCC Rcd. 20140, 20161, ¶ 49, 20168-70, ¶¶ 74-80 (2007) [hereinafter *2007 Order*]; *2004 R&O*, 19 FCC Rcd. at 12544-45, ¶¶ 181-82, 12566, ¶ 238. The Commission also consistently refused to compensate providers for a mark-up on expenses, the costs of research and development for enhancements that exceed mandatory minimum requirements, i.e., the baseline technical and operational standards providers must meet, *see* 47 C.F.R. § 64.404(b), and the costs of providing videophones, software, and technical assistance to VRS users. *2007 Order*, 22 FCC Rcd. at 20161, ¶ 49, 20170, ¶ 82; *2004 R&O*, 19 FCC Rcd. at 12543-44, ¶¶ 179-81, 12547-48, ¶¶ 189-90; *see also In re Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Mem. Op. & Order, 21 FCC Rcd. 8063, 8071-72, ¶¶ 17-19 (2006) [hereinafter *2006 MO&O*] (denying request to add categories of compensable costs).

In 2007, the Commission sought to align reimbursement with actual compensable costs more closely and so adopted a three-year rate plan that included, for the first time, a tiered-rate structure. *2007 Order*, 22 FCC Rcd. at 20161, ¶ 48, 20163, ¶ 53. In order to reflect economies of scale, providers were compensated at a lower per-minute rate for minutes in excess of 50,000 per month, and at a still lower rate for minutes in excess of 500,000 per month. *Id.* at 20167, ¶ 67.

In 2010, the Commission began a major effort to overhaul VRS compensation and cut back on waste and fraud.

It issued a Notice of Inquiry in which it set forth problems with per-minute compensation and posed open-ended questions about a better methodology. *See In re Structure & Practices of the Video Relay Serv. Program*, Notice of Inquiry, 25 FCC Rcd. 8597 (2010). Pending this overhaul, the Commission announced it would set interim rates based in part upon actual historical costs instead of relying exclusively upon the projected costs providers had been submitting. *In re Telecomms. Relay Servs. & Speech-to Speech Servs. for Individuals with Hearing & Speech Disabilities*, Order, 25 FCC Rcd. 8689, 8692-93, ¶ 6 (2010) [hereinafter *2010 Rate Order*].

The TRS Fund Administrator recommended blending the projected and historical costs to ease the austerity of this new methodology, and the Commission ultimately departed upward even from that recommendation because it would have entailed a sudden and significant diminution in revenues for VRS providers. *Id.* at 8695-96, ¶ 12. For the 2009-2010 year, providers had received $6.70, $6.43, and $6.24 for minutes in the three tiers respectively; the Administrator's proposal for 2010-2011 was $5.78, $6.03, and $3.90, and the adopted rates were an average of the two, *viz.*, $6.24, $6.23, and $5.07. *Id.* at 8694, ¶ 8 tbl.1.

Sorenson petitioned the U.S. Court of Appeals for the Tenth Circuit for review of the 2010 Rate Order, claiming it violated both the ADA and the APA. *See Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035 (2011). There it challenged both the tiered-rate structure and the particular rates, but the Tenth Circuit upheld the 2010 Rate Order in both respects. *Id.* at 1038.

Continuing its overhaul effort, in 2011 the Commission issued a Further Notice of Proposed Rulemaking, in which it

called for comments on several proposals, including the institution of a per-user rate methodology and the elimination of the tiered-rate structure. *2011 Notice*, 26 FCC Rcd. at 17394, ¶ 53, 17396, ¶ 59, 17418, ¶ 141. Sorenson and the other providers responded with comments on these proposals and with suggestions of their own.

In 2013 the Commission struck out in a new direction, announcing its intention to set compensation rates through competitive bidding among VRS providers. *See In re Structure & Practices of the Video Relay Serv. Program, Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Report & Order & Further Notice of Proposed Rulemaking, 28 FCC Rcd. 8618, 8661, ¶ 107, 8706-07, ¶ 217 (2013) [hereinafter *2013 Rate Order*]. Because three years had elapsed since last setting VRS rates, however, the Commission also set a new "transitional rate plan" for 2013-2017 in order to bring per-minute rates still closer to historical compensable costs. *Id.* at 8694, ¶ 188, 8702-04, ¶¶ 209, 212.

The plan set the TRS Fund Administrator's rate recommendation, which was based upon updated historical cost data, as the goal at the end of a "glide path." *Id.* at 8704, ¶ 212. The rates are to be adjusted downward every six months, starting at $5.98, $4.82, and $4.82 in 2013 and ending at $4.06, $4.06, and $3.49 in 2017. *See id.* at 8705, ¶ 215 tbl.2. Additionally, the plan adopted a new tier structure in order better to reflect evidence of the minimum efficient scale for providing VRS. *See id.* at 8698-702, ¶¶ 197-208. Tier II minutes now start at 500,000 and Tier III minutes start at 1,000,000. It also reduced the difference in the per-minute rates between tiers. *Id.* at 8702, ¶ 208 tbl.1.

Sorenson petitioned this court for review of the 2013 Rate Order. As in its Tenth Circuit case against the 2010 Rate Order, it challenges both the tiered-rate structure and the rates themselves.

## II. Analysis

We address first the preclusive effect of the Tenth Circuit's resolution of Sorenson's challenges to the 2010 Rate Order. We then turn to the merits of Sorenson's challenges unique to the 2013 Rate Order.

## A. Issue Preclusion

The Commission asks us to dismiss Sorenson's entire petition for review on the ground it is precluded by the Tenth Circuit's decision denying the Company's challenge to the 2010 Rate Order, which raised the same issues with respect to the same ratemaking methodology as does the present petition. According to the Commission, it is immaterial that the present challenge is to a distinct rate order, whereas Sorenson argues the doctrine of issue preclusion is entirely inapplicable to the rates adopted in the 2013 Rate Order.

The doctrine of issue preclusion bars "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). As applied to a challenge to agency action, this court has consistently held a petitioner may not relitigate an agency's "standards and procedures ... prior to each application" thereof. *W. Coal Traffic League v. ICC*, 735 F.2d 1408, 1410 (1984); *accord Nat'l Classification Comm. v. United States*,

765 F.2d 164, 169-70 (1985). Therefore, in order to avoid issue preclusion, a petitioner bringing a successive challenge to the application of an established ratemaking methodology that the agency did not reconsider (or change) must show circumstances have changed in a way that required the agency to reconsider (or to change) it. *Cf. Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1290 (D.C. Cir. 2000) (in an adjudicatory proceeding, agency may preclude repeat argument that a rate is unreasonable unless the challenger presents "new evidence" or demonstrates "changed circumstances"); *W. Coal Traffic League*, 735 F.2d at 1410 (where rulemaking is "standard-setting, not standard-implementing, in character," issue preclusion will not bar a challenge to an agency's "renewed consideration" of an existing standard it ultimately decides to retain). This application of the doctrine is consistent with *Commissioner v. Sunnen*, 333 U.S. 591 (1948), where the Supreme Court explained that a party could be collaterally estopped from relitigating the judicial determination of a tax issue it had raised and lost with respect to a prior tax year, but warned that "where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive." *Id.* at 599-600.

    1. Compensable expenses

Pursuant to these principles, we hold Sorenson's challenge to the Commission's list of compensable expenses is precluded. More specifically, Sorenson argues the rates should be calculated to reimburse its costs for providing users with video equipment, training users, porting phone numbers, and "raising and servicing [debt] capital." With regard to all these expenses, however, Sorenson is merely attempting to relitigate an application of the standard it challenged in its petition for review of the 2010 Rate Order. *See Sorenson*,

659 F.3d at 1046 ("In [Sorenson's] view, [the Administrator's] proposed rates are badly flawed because they do not reflect Sorenson's actual costs of providing services"); *2013 Rate Order*, 28 FCC Rcd. at 8695-98, ¶¶ 191-96 (approving the same compensable costs as had the previous order and addressing questions raised about the categories in the 2011 Notice).

The Tenth Circuit rejected Sorenson's challenge to the Commission's current list of compensable costs, holding the agency had neither violated the ADA nor failed the arbitrary-and-capricious test of the APA. 659 F.3d at 1043-45; *id.* at 1046-47. Sorenson points to no new evidence or changed circumstances suggesting the Commission was required to expand its list of compensable costs.

Sorenson does argue two features of the 2013 Rate Order make the Commission's application of the list of compensable costs different from its application in the 2010 Rate Order, thus suggesting the Tenth Circuit did not actually decide the issues Sorenson is raising now. First, the 2013 Rate Order includes a provision directing and funding a neutral third party to develop a "VRS access technology reference platform" that will operate as a software application and be "useable on commonly available off the shelf equipment and operating systems." *2013 Rate Order*, 28 FCC Rcd. at 8644-45, ¶¶ 53-55. According to Sorenson, this provision suggests the Commission has a new interpretation of its statutory mandate that makes giving video equipment to users free of charge a necessary cost. *But see id.* at 8696, ¶ 193 (reiterating the agency's consistent position, *see, e.g.*, *2006 MO&O*, 21 FCC Rcd. at 8071, ¶ 17, that providers may be compensated only for "*the providers'* expenses in making the service available and not the customer's costs of receiving the equipment").

On the contrary, developing a common platform for off-the-shelf equipment and operating systems will make provider-funded video equipment even less relevant to the provision of VRS and will give users an experience more closely akin to that of hearing telecommunications customers, who buy their equipment off the shelf. *See 2011 Notice*, FCC Rcd. at 17380, ¶ 19 ("Indeed, currently available commercial video technology can provide closer functional equivalence, may be less costly, and is likely to improve at a faster pace than the custom devices supplied exclusively by VRS providers"). Therefore, the Tenth Circuit's determination the statute does not require that "VRS users receive free equipment," only that they "pay no higher rates for calls than others pay for traditional phone services," is preclusive. *Sorenson*, 659 F.3d at 1044.

Second, Sorenson points out that the 2013 Rate Order sets rates for four years (until 2017), whereas the 2010 Rate Order set rates for one year (although the Commission later renewed those rates for two more years, i.e., until 2013). Therefore, Sorenson argues, the Tenth Circuit could not have resolved any issue with regard to a four-year rate plan because the rates it reviewed were "interim" in nature and the Tenth Circuit upheld the rates on the premise that the Commission soon would revisit its ratemaking methodology.

Sorenson's focus upon the respective timeframes of the 2010 and 2013 Rate Orders is misplaced. Because the agency is transitioning to a new ratemaking methodology, the 2013 Rate Order is "interim" in the precise way the 2010 Rate Order was when the Tenth Circuit reviewed it. *See Sorenson*, 659 F.3d at 1046 n.6 (relying upon the Commission's "intention that the new rates be temporary while it totally reevaluates VRS compensation"). Nor has anything of significance changed over the years between the two Orders;

both adopt per-minute rates based upon the same long-standing list of compensable costs. Therefore, Sorenson's challenge to the compensable expenses is precluded by our sister circuit's holding that "the categories of compensable costs in [the] proposed rates are the same categories that were compensable when the agency reimbursed on the basis of providers' projected costs. … Particularly given this consistent position on allowable costs, the Commission provided a sufficient explanation for declining to change the categories of allowed costs during the interim period." *Sorenson*, 659 F.3d at 1046-47.

2. Other issues

Contrary to the Commission's contention, none of Sorenson's four other challenges to the 2013 Rate Order is precluded. First, Sorenson challenges the levels at which the Commission set rates of return on labor and on capital investments. Although these levels are the same in the 2013 and 2010 Rate Orders, perusal of its briefs in the earlier case makes clear that Sorenson did not challenge those rates before the Tenth Circuit and so they have not been "actually litigated and resolved" by a court.

Sorenson's other three challenges concern features unique to the 2013 Rate Order and therefore could not have been resolved in the Tenth Circuit case. Sorenson challenges the "end result" of the Order, *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) (first adopting the "end result" criterion), claiming it will cause VRS providers to go out of business and hence will disrupt service to hearing- and speech-impaired individuals. This alleged problem clearly is unique to the 2013 Rate Order; the Tenth Circuit specifically said Sorenson, in its challenge to the 2010 Rate Order, did "not contend that under the interim VRS rates

it, or any other provider, will be unable to serve any customer who requests service." 659 F.3d at 1043. Likewise, Sorenson is not precluded from arguing the rate is too low to cover providers' costs of complying with the requirement that they answer 85% of calls within 30 seconds, measured daily, because that speed of answer was newly imposed by the 2013 Rate Order. *Cf. id.* ("Sorenson does not claim that it will be unable to satisfy the mandatory 80/120 speed-of-answer requirement under the interim rates").

Finally, Sorenson challenges the new tiered-rate structure in the 2013 Rate Order. The Tenth Circuit, although it upheld the tiered-rate structure in the 2010 Rate Order, *id.* at 1048-50, could not have resolved Sorenson's challenge to the tiered-rate structure in the 2013 Rate Order because the Commission adopted a new "configuration" for the tiers, raising the cut-offs and reducing the differences between tiers, as a step toward realization of its plan to institute competitive bidding among firms in the future. *See 2013 Rate Order*, 28 FCC Rcd. at 8698-702, ¶¶ 197-208. Moreover, Sorenson argues the tiered rates are arbitrary and capricious in light of "new evidence" and a "changed circumstance," respectively: The Commission maintained a tiered-rate structure even as it acknowledged new evidence about minimum efficient scale and concluded that tiered rates were inefficient.

We turn next to address the merits of the four above-mentioned issues.

B.  Rate of Return

Sorenson argues the Commission's interim ratemaking methodology "virtually guarantees that providers will be unable to earn a reasonable rate of return" because it allows for an 11.25% rate of return on physical capital but no return

on labor, which is "the primary thing [providers] sell." According to Sorenson, this limitation, which originated with monopoly telephone companies, is inappropriate and hence arbitrary and capricious as applied to the labor- rather than capital-intensive VRS industry. The reasonableness of the rates, it maintains, should be judged on the profit margin as a percentage of its total cost, which it shows is likely to be less than 2% under the agency's interim methodology.

1. Denial of a return on labor costs

As the Commission has explained more than once, a provider of VRS is entitled to compensation only for the reasonable costs of providing VRS. *2013 Rate Order*, 28 FCC Rcd. at 8692, ¶ 181; *see also* 47 U.S.C. § 225(d)(3)(B) (the TRS Fund shall reimburse only the "costs caused by interstate telecommunications relay services"); *In re Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Report & Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 19 FCC Rcd. 12475, 12543-44, ¶ 181 (2004) [hereinafter *2004 Order*] (reasonable costs are ''those direct and indirect costs necessary to provide the service''). Therefore, the Commission acts directly in accordance with its statutory mandate by setting rates to compensate providers for their actual labor costs. Wages are the costs of hiring labor, just as interest and dividends are the cost of hiring capital. A "return" on labor costs in addition to revenues sufficient to cover the wages themselves would in effect increase the Company's compensation above what is necessary for the provision of VRS. *See 2007 Order*, 22 FCC Rcd. at 20161, ¶ 49 ("[T]he 'reasonable' costs of providing service for which providers are entitled to compensation do not include profit or a mark-up on expenses"). Therefore, Sorenson has not met its burden of showing the agency's

decision to provide for recovery of labor costs as an expense was arbitrary or capricious. *See generally* 1 ALFRED E. KAHN, THE ECONOMICS OF REGULATION: PRINCIPLES AND INSTITUTIONS 26-54 (1970) (discussing the proper compensation for operating costs versus capital outlays).

2.  Sufficiency of the return on capital

Sorenson next argues that it was arbitrary and capricious for the Commission to set the rate of return on capital at 11.25%, which rate it borrowed 20 years ago from its regulation of monopoly telephone companies. Although there are, of course, many differences between the traditional telephone business and VRS, that alone is not cause to vacate the rate of return. "Even assuming [the agency] made missteps ... , the burden is on petitioners to demonstrate that [the agency's] ultimate conclusions are unreasonable." *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1146 (D.C. Cir. 2002).

Sorenson advances two specific reasons for deeming the 11.25% rate of return unreasonable: (1) when spread over all costs, the rate yields a gross profit margin of less than 2%, and (2) the rate is too low to attract necessary capital to the VRS business. The first argument has no merit whatsoever; the second is simply unproven.

As we explained in relation to labor costs, and as the Commission has been explaining since its 2004 Order, 19 FCC Rcd. at 12543-44, ¶¶ 178-81, the agency is not required to compensate providers for anything more than the reasonable costs of providing VRS, which include the cost of hiring the necessary capital. A provider's accounting profit margin as a percentage of its total costs is of no moment whatsoever.

In contrast, if Sorenson is correct that the 11.25% rate of return is too low to attract the capital necessary to operate a VRS business, then it should prevail in its quest for a higher rate. *Cf. Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1178 (D.C. Cir. 1987) (en banc) ("[T]he reviewing court 'must determine' whether the Commission's rate order may reasonably be expected to 'maintain financial integrity' and 'attract necessary capital.'" (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968))). Sorenson raised this issue before the agency by arguing VRS presents a "significantly different risk profile to the capital markets" than does a conventional telephone company. It pointed out the VRS industry is competitive rather than monopolistic, the firms are smaller, and the regulatory risk is greater because VRS providers receive nearly all their revenue not from a large number of customers but from a single source, *viz.*, the TRS Fund.

Although these differences do suggest a telephone company's rate of return is not an obvious proxy for reimbursing a provider of VRS, we cannot conclude the Commission's admittedly flawed[*] basis for selecting a rate leads to an arbitrary and capricious result because there is no evidence in the record to suggest Sorenson or any other provider actually has had trouble raising the necessary capital under the long-standing 11.25% rate regime. Because the Commission is required to raise the allowable rate of return only if presented with evidence the current rate is insufficient to attract capital, Sorenson did not carry its burden of proof

---

[*] The Commission acknowledges the rate of return is based upon a flawed analogy; in its view, however, the rate is too high because capital is less expensive than it was 20 years ago. *See* FCC Br. 40 (citing proceedings to lower the authorized rate of return as part of a comprehensive reform of the Universal Service Fund).

before the agency. *Cf. Tesoro*, 234 F.3d at 1290 (suggesting a ratemaking agency is required to revisit whether its existing ratemaking methodology is reasonable only when presented with new evidence or changed circumstances). Therefore, we defer to the Commission's judgment that its long-standing 11.25% rate of return provides an adequate, and thus reasonable, approach to setting per-minute rates while transitioning to a new methodology.

C.  End Result of the Rates

Sorenson next challenges the 2013 Rate Order as arbitrary and capricious because the Commission did not respond to its evidence that the end result of the rates would be to "drive every provider out of business or into bankruptcy," degrading service and violating the statutory mandate requiring service be made "available, to the extent possible," 47 U.S.C. § 225(b)(1). Sorenson's challenge to the end result of the rates is distinct from its challenge to the component parts of the agency's ratemaking methodology, *see Jersey Cent.*, 810 F.2d at 1177 ("In examining the end result of the rate order, ... a court cannot affirm simply because each of the component decisions of that order, taken in isolation, was permissible; it must be the case 'that they do not *together* produce arbitrary or unreasonable *consequences*'" (quoting and adding emphasis to *Permian Basin*, 390 U.S. at 800)); Sorenson, however, fails to establish the end result of this Rate Order is arbitrary or unreasonable. It is not unreasonable for the Commission to allow a provider to go bankrupt if that provider has incurred costs far in excess of what is necessary.

Sorenson points out that comments before the agency by all the major providers indicated "no provider could offer service at the rates proposed by the Administrator," but the

comments to which it refers are inapposite to Sorenson's claim because they addressed the rates proposed by the Administrator,[*] not the higher rates and "glide path" actually adopted by the Commission. Perhaps that is why the other providers, which did not incur the same level of non-compensable costs, are not petitioning for review of the 2013 Rate Order. In any event, the Commission explained why it would not cover all of a provider's actual costs even if the result were to bankrupt the company. In the Order under review it reasoned that it would be "irresponsible and contrary to our mandate to ensure the efficient provision of TRS ... to simply reimburse VRS providers for all capital costs they have chosen to incur – such as high levels of debt – where there is no reason to believe that those costs are necessary to the provision of reimbursable services." *2013 Rate Order*, 28 FCC Rcd. at 8697, ¶195. The agency was even more explicit about the prospect of bankruptcy in the Notice that preceded the Order:

---

[*] *See, e.g.*, Comments of CSDRVS, LLC, Docket Nos. 10-51 & 03-123, 2-3 (May 31, 2013) (J.A. 825-26) (discussing "The RLSA Rate Proposal"); Comments of Purple Commc'ns., Inc., Docket Nos. 10-51 & 03-123, 12 (Nov. 14, 2012) (J.A. 624) (discussing "TRS Fund Administrator's Rate Proposal"); Comments of Convo Commc'ns., Inc., Docket Nos. 10-51 & 03-123, 5-6 (Nov. 14, 2012) (J.A. 552-53) (discussing "The VRS Rates Proposed by RLSA"); Ex Parte Notice of CSDVRS, LLC, Docket Nos. 10-51 & 30-123 (Oct. 25, 2012) (objecting to "compensation rates if they are at all similar to what Rolka Loube Saltzer Associates ("RLSA") has proposed); Comments of Hancock, Jahn, Lee & Puckett, LLC d/b/a Communication Axcess Ability Group (CAAG), Docket Nos. 10-51 & 03-123, 5-7 (Nov. 15, 2012) (discussing "RLSA's Rate Proposals").

> If ... some providers are not able to manage their businesses, gain scale, or support their existing capital structures during a transition period, they will likely have to change their current business plans. ... We ... will not act to preserve any particular competitor. We do not believe that any provider has an inherent entitlement to receive compensation from the Fund, and so do not regard as the goal the protection of VRS providers who are high cost and/or uncompetitive.

*2011 Notice*, 26 FCC Rcd. at 17399, ¶ 66.

Sorenson's costs were particularly high for two reasons. First, it was saddled with the debt it had incurred to finance a leveraged buyout. (A private equity firm, having acquired the Company, then caused it to incur substantial debt in order to fund a dividend to its new owner.) *See In re Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities*, Order Denying Stay Motion, 25 FCC Rcd. 9115, 9121, ¶ 21 (2010). In addition, Sorenson purchased and then gave users videophones free of charge in order to encourage their use of its service, but the cost of that equipment was not and never had been deemed compensable by the Commission. *See id.* at 9120, ¶ 16. The reasons for Sorenson's financial hardship, therefore, are precisely the reasons the Commission had rightly warned were insufficient justification for raising rates. Moreover, Sorenson is wrong to equate bankruptcy with an inability to provide reasonable service; the Commission did not have before it any evidence that Sorenson's service would be degraded if its debt obligations were reduced or restructured as equity in a bankruptcy proceeding. Nor does Sorenson give us any reason to believe insolvency would cause a provider to exit the market so long as the reasonable costs of continuing to

provide service, including an appropriate return on equity and wages sufficient to attract labor, remain fully recoverable.

D.  Speed-of-Answer Requirement

Sorenson's penultimate challenge is to the new speed-of-answer requirement, with which it claims it cannot comply at the per-minute rates set by the Order.  In response to the Commission's call for comments about whether to tighten this requirement, *see 2011 Notice*, 26 FCC Rcd. at 17405, ¶ 87 ("[S]hould the speed of answer requirements set forth in [47 C.F.R. §] 64.604(b)(2) be modified?"), Sorenson explained that a faster speed of answer meant a higher cost of service. Reply Comments of Sorenson, Commc'ns., Inc., Docket Nos. 10-51 & 03-123, 49 (Mar. 30, 2012) (J.A. 410) ("speed-of-answer is directly affected by compensation levels"). Because the Commission did not specify the metric it was considering, however, Sorenson did not have occasion to state whether or by how much its labor cost would increase if it were required to answer 85% of all calls within 30 seconds, measured daily (as the Commission went on to require) rather than 80% of all calls within 120 seconds, measured monthly (as it had been required to and was doing).

The Commission adopted this more demanding speed-of-answer requirement based in part upon the explicit premise that it would not increase labor costs over the historical costs upon which the rates in the 2013 Rate Order are based, contrary to the general relationship suggested by Sorenson and without citing any evidence to dispel that suggestion. *See 2013 Rate Order*, 28 FCC Rcd. at 8671-72, ¶¶ 137 & 139 ("[T]his action will set a new standard for VRS provider performance without additional cost to providers or the TRS Fund").  Even if the Commission was correct in saying "[t]he record indicates that VRS providers already achieve a speed

of answer of 30 seconds for the majority of VRS calls," *id*. at 8671, ¶ 137 – an assertion for which we have found no support – that says nothing about the cost of achieving the 30-second speed of answer 85% of the time, measured daily. Indeed, counsel for the Commission conceded at oral argument that, to the extent it adopted the new standard on the premise that providers were already meeting that standard measured daily, the agency was mistaken. Oral Arg. R. 29:40-30:05.

The Commission argues this challenge to the speed-of-answer requirement is not ripe for judicial review because Sorenson "never presented [it] to the Commission." We have held, however, an issue is ripe for review pursuant to section 405(a) of the Communications Act of 1934, 47 U.S.C. § 405(a), if the Commission had an "opportunity to pass" upon the question of fact or law raised in the petition; the party need not have raised the precise argument before the agency. *See Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998). Because the Commission had before it comments that suggested costs would go up under an enhanced metric for speed of answer, and because it reached the opposite conclusion on that very issue, the Commission had and indeed took the opportunity to pass upon the question. Therefore, Sorenson's challenge is ripe for judicial review.

Turning to the substance of that challenge, we need hardly do more than note that the Commission is, by its own interpretation of the ADA, required to reimburse providers for all costs necessarily incurred to meet the mandatory minimum standards established by the agency, *see 2004 Order*, 19 FCC Rcd. at 12543-44, ¶ 181, of which speed-of-answer is one, *see* 47 C.F.R. § 64.604(b)(2)(iii). By adopting the new speed-of-answer metric without evidence of the cost to comply with it,

the Commission acted arbitrarily and capriciously. *See Permian Basin*, 390 U.S. at 792 ("[E]ach of the order's essential elements [must be] supported by substantial evidence"). Moreover, because the only evidence before the Commission was Sorenson's submission indicating costs go up when standards of service go up, the new metric fails the "requirement of reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *accord Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (a decision is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency").

Sorenson asks us to remedy this error by vacating the new rates in the 2013 Rate Order. We think it more appropriate for two reasons instead to vacate the new speed-of-answer requirement. First, it is the less disruptive course, more precisely tailored to the problem with the Order. *Cf. Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 212 (D.C. Cir. 2007) (vacating only the offending parts of a rule despite petitioner's request for vacatur of the whole). Second, we think the Commission, in expressing its understanding that it could adopt the new requirement without adding to costs, implied that its priority was to keep rates down, not to force the quality of service up; i.e., it wanted what it thought was a free lunch, leaving us in doubt whether it wanted the lunch if it was not free. On remand, the Commission is free, of course, to renew its consideration of the tradeoff: It may adhere to the status quo ante, reinstate the requirement we vacate today, or impose a different standard, as long as it bases its decision upon evidence of the required labor costs and adjusts the rates in the 2013 Rate Order to reflect any increase over the historical costs upon which they were based.

E.  Tiered-Rate Structure

Finally, Sorenson contends the tiered-rate structure is arbitrary and capricious for two distinct reasons.  First, it argues, having tiered rates is inherently contrary to the Commission's stated position that they are inefficient and should be eliminated.  *2013 Rate Order*, 28 FCC Rcd. at 8698, ¶ 198 (the TRS Fund should not "support indefinitely VRS operations that are substantially less efficient"); *see also 2011 Notice*, 26 FCC Rcd. at 17418, ¶ 141 (the "tiered rate structure supports an unnecessarily inefficient market structure, and apparently provides insufficient incentive for VRS providers to achieve minimal efficient scale").  As we see it, however, the decision to retain the tiers while transitioning to a competitive-bidding scheme is not inconsistent with the Commission's stated position.  The agency made clear in the 2013 Rate Order that it still plans to eliminate the per-minute rate methodology and that its critique of tiered rates guided its planning for the interim. *2013 Rate Order*, 28 FCC Rcd. at 8702, ¶ 205.  It raised the cut-offs between the tiers immediately and will reduce over time the gap between the highest and lowest tiered rates, which adjustments increase the incentive to achieve minimum efficient scale, consistent with the concerns it expressed in the 2011 Notice. *See id.* at 8698, ¶ 198.

Second, Sorenson challenges the specific cut-off levels demarcating the new tiers, arguing they are not optimal for achieving the Commission's stated goal of supporting smaller providers until they grow to an efficient scale and are able to compete effectively.  At its core, this objection is no more than a quibble over the precise cut-off that would be most efficient in the short term, and is certainly not significant enough to impugn the agency's transitional methodology, which is explicitly aimed at achieving efficiency in the long

run. *See id.* at 8699, ¶ 200 ("We conclude that it is worth tolerating some degree of additional inefficiency in the short term, in order to maximize the opportunity for successful participation of multiple efficient providers in the future, in the more competition-friendly environment that we expect to result from our structural reforms"). As we have noted before with regard to ratemaking, "[t]he relevant question is whether the agency's numbers are within a zone of reasonableness, not whether its numbers are precisely right." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (quotation marks omitted). Because the Commission relied upon evidence in the record that supports its conclusions about minimum efficient scale, *see, e.g.*, *2013 Rate Order*, 28 FCC Rcd. at 8699-700, ¶¶ 202-03, we are satisfied the cut-offs are within the zone of reasonableness and we defer to the agency's judgment about how best to achieve a smooth transition to competitive bidding.

## III. Conclusion

For the foregoing reasons, we vacate only the new speed-of-answer requirement prescribed in ¶¶ 135-39 of the 2013 Rate Order. 28 FCC Rcd. at 8671-72. We remand that portion of the Order to the Commission to consider whether an enhanced speed-of-answer requirement will increase providers' costs and, if so, whether having faster service is worth the concomitant increase in rates. Pending further action by the Commission, this decision will have the effect of reinstating the requirement that 80% of VRS calls be answered within 120 seconds, measured on a monthly basis. *See id.* at 8671, ¶ 135.

*So ordered.*