# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 7, 2018          Decided July 24, 2018

No. 17-1198

SORENSON COMMUNICATIONS, LLC,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

Consolidated with 17-1202

On Petitions for Review of an Order of
the Federal Communications Commission

*Donald B. Verrilli Jr.* argued the cause for petitioner
Sorenson Communications, LLC. With him on the briefs were
*Michael B. DeSanctis*, *Ginger D. Anders*, *Sarah G. Boyce*, and
*Rachel G. Miller-Ziegler*.

*Anthony C. Kaye* argued the cause for petitioner Video
Relay Services Consumer Association. With him on the briefs
was *Daniel J. Tobin*.

*C. Grey Pash Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Thomas M. Johnson, Jr.*, General Counsel, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered an appearance.

*Jeffrey T. Rosen*, *pro hac vice*, argued the cause for *amici curiae* Convo Communications, LLC, et al. With him on the brief was *George L. Lyon Jr.*

Before: GRIFFITH, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Video Relay Service (VRS) enables people with hearing or speech impairments to communicate with people who use standard telephones. The VRS user communicates in sign language with an interpreter through a video connection, and the interpreter speaks with the hearing person using a standard phone. VRS is provided by several private companies who are reimbursed through rates set by the Federal Communications Commission (FCC). Two parties bring different challenges to the rates set by the FCC in 2017: Sorenson Communications, LLC ("Sorenson"), the largest VRS provider, and the Video Relay Services Consumer Association (VRSCA), an unincorporated information forum for VRS users. We dismiss VRSCA's petition for lack of standing and deny Sorenson's petition on the merits.

3

I

A

The Americans with Disabilities Act directs the FCC to ensure that telecommunications services are available and accessible to people with hearing or speech impairments. *See* Pub. L. No. 101-336, tit. IV, § 401, 104 Stat. 327, 366 (1990) (codified as amended at 47 U.S.C. § 225). These services are broadly known as telecommunications relay services (TRS), which enable a person who is "deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio . . . *in a manner that is functionally equivalent* to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio." 47 U.S.C. § 225(a)(3) (emphasis added). The FCC must also ensure that TRS is "available, to the extent possible and in *the most efficient manner*," to people with hearing and speech disabilities. *Id.* § 225(b)(1) (emphasis added). The dispute in this case ultimately turns on whether the FCC's compensation rates for TRS comply with § 225's mandate to provide functionally equivalent communication services in the most efficient manner.

There are several types of TRS, but only one is relevant here. VRS "allows people with hearing or speech disabilities who use sign language to communicate with voice telephone users through video equipment." 47 C.F.R. § 64.601(a)(43). VRS video equipment functions somewhat like Skype or Apple's FaceTime by providing a visual connection between the caller and an American Sign Language (ASL) interpreter who is employed by the VRS provider. The interpreter then makes a standard voice call to the hearing recipient and translates between the two, signing with the caller and speaking

with the recipient. *See generally Sorenson Commc'ns, Inc. v. FCC* ("*Sorenson I*"), 659 F.3d 1035, 1039 (10th Cir. 2011); *Sorenson Commc'ns, Inc. v. FCC* ("*Sorenson II*"), 765 F.3d 37, 40 (D.C. Cir. 2014). Ultimately, there are three interacting components: VRS access technologies, such as a videophone; the video communication "platform" that routes calls; and the relay service provided by ASL-fluent communications assistants. Order, Structure & Practices of the Video Relay Serv. Program, 28 FCC Rcd. 8618, 8621 (2013) ("2013 Order").

Today, the majority of VRS is provided by several private companies, all of which are involved in this case as either petitioner or amicus curiae. Sorenson is the dominant VRS provider, holding approximately 80% of the market since at least 2013. The four other VRS providers, two of which recently merged, share the remaining 20% of the market and are amici in this case.[1]

The VRS market is not a traditional competitive market. Under § 225, VRS users do not pay any additional costs for VRS beyond what they would pay for standard telephone services. *See* 47 U.S.C. § 225(d)(1)(D). Instead of charging users for the additional cost of VRS, providers are compensated through the FCC's Interstate TRS Fund ("TRS Fund"), which is supported by fees levied on telecommunications services.

---

[1] ZVRS Holding Company owns two VRS subsidiaries: CSDVRS, LLC d/b/a ZVRS ("ZVRS") and Purple Communications, Inc. ("Purple"), the latter of which it acquired in February 2017, though the integration is not yet complete. Collectively, ZVRS and Purple account for 17% of the VRS market. The two other VRS providers, ASL Services Holdings, LLC d/b/a GlobalVRS and Convo Communications, LLC, collectively make up about 3% of the market.

*See id.* § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii)(A). The FCC sets a per-minute rate to reimburse VRS providers for their "reasonable costs" and then makes direct payments to the providers from the TRS Fund based on their total number of minutes. 47 C.F.R. § 64.604(c)(5)(iii)(E). Under the current rate structure, Sorenson is also the lowest-cost provider of VRS, meaning that the average VRS call with Sorenson is cheaper for the TRS Fund than the average call with other providers.

To receive compensation, VRS providers must comply with certain operational and customer-service requirements, called "mandatory minimum standards." *Id.* § 64.604. These requirements are wide-ranging, for instance specifying the technical types of calls that providers must handle; establishing the process for addressing customer complaints; and requiring ASL interpreters to have "familiarity with hearing and speech disability cultures, languages, and etiquette." *Id.* The FCC promotes compliance with these standards through various techniques, including competition among VRS providers.

B

1

Before 2007, the FCC set a single per-minute compensation rate based on all VRS providers' projections of their costs for the upcoming year. *See* Telecomms. Relay Servs. & Speech-to-Speech Servs. for Individuals with Hearing & Speech Disabilities, 22 FCC Rcd. 20,140, 20,144-45 (2007) ("2007 Order"). That approach proved problematic, however, so the FCC established a three-tiered rate structure in 2007. *Id.* at 20,163, 20,168. This structure compensated VRS providers based on the total number of monthly minutes they projected they would provide. As a provider's volume increased, the per-

minute rate decreased to account for the provider's lower marginal costs as it benefited from economies of scale. *Id.* at 20,163, 20,168.[2] Thus smaller providers largely received Tier I compensation, which compensates at the highest rate; more established providers mostly received compensation under Tiers I and II; and dominant providers (today, only Sorenson) received compensation under all three tiers, earning relatively less for the minutes provided in Tier III.

In 2010, the FCC established an interim three-tiered rate structure for one year. *See* Order, Telecomms. Relay Servs. and Speech-to-Speech Servs. for Individuals with Hearing and Speech Disabilities, 25 FCC Rcd. 8689 (2010) ("2010 Interim Rate Order"). The rates were designed as a placeholder until the FCC completed a review of the VRS program, which was experiencing several challenges. *Id.* at 8693. In particular, the FCC determined that VRS providers were being "significantly overcompensated," *id.* at 8698, because their "projections consistently overstate[d] their costs," *id.* at 8694-95. To address this problem, the FCC based the interim rates on a blend of providers' actual historical costs and the TRS Fund administrator's analysis of providers' projected costs. *Id.*

Sorenson sought judicial review of the 2010 Interim Rate Order in the Tenth Circuit, and that court affirmed the FCC's order in its entirety. *Sorenson I*, 659 F.3d 1035. The court rejected Sorenson's various challenges to the VRS rates, the FCC's ratemaking methodology, and the three-tiered rate structure. *Id.* at 1050. As relevant here, the court also upheld

---

[2] The compensation rates were set at: $6.77 per minute for a provider's first 50,000 minutes of monthly VRS service (Tier I); $6.50 for minutes 50,001-500,000 (Tier II); and $6.30 for all minutes over 500,000 (Tier III). *See* 2007 Order, 22 FCC Rcd. at 20,164.

the FCC's decision to exclude the cost of providing VRS video equipment from providers' compensable expenses. *Id.* at 1045.

On the same day that the FCC adopted the 2010 Interim Rate Order, the agency also issued a notice that it would "take a fresh look" at VRS rates because of its concern that the VRS program was "fraught with inefficiencies (at best) and opportunities for fraud and abuse (at worst)." Notice of Inquiry, 25 FCC Rcd. 8597, 8598, 8606 (2010). In 2011, the FCC issued an additional notice that discussed possible options for improving the VRS program and solicited comments and proposals from the public and VRS industry. *See* Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17,367 (2011) ("2011 FNPRM"). In particular, the FCC sought comments on whether the agency should replace the tiered-rate structure with a single rate. *See id.* at 17,418.

2

In 2013, the FCC issued an order that adopted a number of structural reforms for the VRS market. *See* 2013 Order, 28 FCC Rcd. 8618. These reforms were designed to remove barriers to effective competition among VRS market participants. One structural reform sought to improve VRS "interoperability." Interoperability ensures that VRS users can make calls with other VRS users regardless of their respective VRS providers. *See id.* at 8639. Another structural reform sought to improve "equipment portability," which refers to a VRS user's ability to switch between default VRS providers without changing their videophones. *See id.* The agency further adopted a rule to establish a neutral video communications platform ("Neutral VRS Platform"), which would provide technical video capabilities for companies who might want to provide only ASL translation services instead of an entire VRS operation. *See id.* at 8656-63.

The 2013 Order also updated the tiered-rate structure with new rates. The FCC designed the new tiers in light of its finding that Sorenson's average cost per minute still fell below the average per-minute cost of its smaller competitors. *See id.* at 8700. The calls were cheaper on average because, for one thing, Sorenson was able to spread its overhead costs over many more minutes of service. Due to this cost difference, the agency stated that it hoped to transition the VRS market away from the tiered-rate structure and toward a single, low rate in the future. *Id.* at 8698-706. The FCC expected that its new structural reforms would make such a transition possible without "unnecessarily constricting the service choices available to VRS consumers" by driving smaller providers out of the market. *Id.* at 8699; *see also id.* at 9698 ("We also believe that our structural reforms, once implemented, will eliminate any residual need for tiered rates.").

To advance the transition to a single rate, the agency planned to narrow the gap between rate tiers over the course of four years. *Id.* at 8699. By using this "glide path," the agency hoped to eliminate the inefficiencies of the tiers while still protecting the long-term competitiveness and efficiency of the market. *See id.* at 8704. Even though immediately adopting a single, low rate might have brought some immediate savings to the TRS Fund, the FCC found that it was "worth tolerating some degree of additional inefficiency in the short term, in order to maximize the opportunity for successful participation of multiple efficient providers in the future, in the more competition-friendly environment that [it] expect[ed] to result from [its] structural reforms." *Id.* at 8699. And finally, the 2013 Order rejected once again Sorenson's request to include video equipment as an allowable cost in determining VRS rates. *Id.* at 8696-97.

Sorenson petitioned our court to review the 2013 Order. We largely upheld the order, remanding only one issue that is not relevant today. *See Sorenson II*, 765 F.3d at 52. We first found that several of Sorenson's challenges essentially repeated arguments it had already made before the Tenth Circuit in *Sorenson I* and were thus barred by issue preclusion. These included its claim that the FCC was required to adopt rates that reimbursed VRS providers for equipment costs. *See id.* at 45. We otherwise concluded that the tiered-rate structure, the applicable rules, and the rates themselves were consistent with § 225 and were not arbitrary and capricious. *See id.* at 45-52. Despite Sorenson's protests that the FCC had already determined the tiered-rate structure to be inefficient, we concluded that "the decision to retain the tiers while transitioning to a competitive bidding scheme [was] not inconsistent with the [FCC's] stated position" in the 2013 Order. *Id.* at 51. And we said we would "defer to the agency's judgment about how best to achieve a smooth transition to competitive bidding." *Id.* at 52.

C

In 2017, after issuing a further notice and accepting proposals from Sorenson and the other providers, *see* Further Notice of Proposed Rulemaking, 32 FCC Rcd. 2436 (2017) ("2017 FNPRM"), the FCC decided to retain a tiered-rate structure for four more years, Order, Structure & Practices of the Video Relay Serv. Program, 32 FCC Rcd. 5891 (2017) ("2017 Order"). That order gave rise to the dispute before us today.

In the 2017 Order, the FCC observed that the VRS market had not changed much since its 2013 Order. Sorenson still controlled 80% of the market, and the smaller providers had not grown enough to achieve "the necessary scale to compete

effectively." 2017 Order, 32 FCC Rcd. at 5893. And although two of the smaller providers merged—potentially creating a stronger competitor against Sorenson—it was too soon to assess the success of the merger. The FCC had anticipated in its 2013 Order that its structural reforms would enable multiple VRS providers to remain in the market without a tiered-rate system; however, that prediction was undercut by the delayed implementation of some reforms and the failure of others. *See id.* at 5905-06; *see also* 2017 FNPRM, 32 FCC Rcd. at 2474. The interoperability standards were not incorporated into the FCC's rules until 2017, 2017 Order, 32 FCC Rcd. at 5905, the equipment portability mandate was similarly delayed, *id.* at 5905-06, and the agency had received no acceptable bids to develop the Neutral VRS Platform, *id.* at 5930-31. In light of the market's then-current state, the FCC concluded that the "best available alternative at present" for establishing rates for the next four years was to maintain a tiered-rate structure. *Id.* at 5905-08; *see also* 2017 FNPRM, 32 FCC Rcd. at 2469-79.

The FCC ultimately provided two main statutory rationales for retaining the tiers. First, keeping that structure would help ensure that multiple VRS providers remained in the market, which in turn would advance the "functional equivalence" of VRS. 2017 Order, 32 FCC Rcd. at 5907-09. Maintaining multiple providers enhances functional equivalence by giving VRS users the choice to select among multiple providers, just as voice telephone users are able to do. It also provides a competitive incentive for the dominant provider to "maintain higher standards of service quality than if it faced no competition." *Id.* at 5907; *see also id.* at 5909 ("Further attrition [of providers] . . . would further limit the ability of consumers to select providers based on service quality and features . . . eroding the [FCC's] ability to ensure the availability of functionally equivalent service."). In other words, competition is a technique that can help ensure

compliance with some of the service-quality requirements outlined in the mandatory minimum standards. In addition, the agency noted that retaining multiple providers through the tiered-rate structure "provides a competitive incentive to improve VRS offerings." *Id.* at 5907. For instance, some of the smaller providers have developed services to meet the "needs of niche populations, including people who are deaf-blind or speak Spanish." *Id.* at 5909-10, 5916-17 & n.153. Given all these benefits, the FCC concluded that retaining the tiered-rate structure may be justifiable on functional equivalency considerations alone, even if it resulted in somewhat reduced efficiency. *Id.* at 5909.

As a second rationale, the FCC concluded that retaining the tiers actually advanced the statute's efficiency mandate as well. The agency reasoned that its efficiency mandate required it to look beyond "short-term savings in an accounting sense" and also consider the "long[-]run" efficiency of the VRS program. *Id.* at 5909-10. To promote the long-term health of the program, the FCC determined it should work to "prevent the VRS marketplace from devolving into a monopoly," which would limit the agency's ability to "improve efficiency." *Id.* at 5910; *see also id.* at 5907 & n.91, 5909.

For these reasons, the FCC rejected Sorenson's proposal of setting a single, uniform rate for all providers. Given the state of the market, the single-rate approach would require the agency to choose between two inefficient options: (1) setting a low uniform rate, which would force *all* of the smaller providers out of the market, or (2) adopting Sorenson's proposal and setting a higher uniform rate, which *might* allow a competitor to stay in the market but would provide windfalls to Sorenson because of Sorenson's low average cost for VRS calls. The first option would yield a Sorenson monopoly; the second option would result in "greatly increased TRS fund

expenditures" because Sorenson's average compensation per minute would increase. *Id.* at 5907.[3] Retaining the tiered-rate structure, on the other hand, would help "ensure greater efficiency without sacrificing competition, by tailoring compensation rates more closely to the costs of those competitors falling within each tier." *Id.* at 5908. In sum, retaining the tiered-rate structure not only promoted long-term efficiency by preventing a monopoly, but it was also the most efficient short-term proposal that was actually *presented* to the agency.

After rejecting several alternative proposals, the FCC established the new tiered-rate structure. First, the agency added an "emergent rate" for fledgling VRS providers who deliver fewer than 500,001 minutes per month. *Id.* at 5916. Second, the FCC adjusted the rates and number of minutes that defined the three tiers. *Id.* at 5918-24.[4] In reaching these rates, the FCC considered covering providers' costs, preserving competition, and minimizing any incentive for providers to slow their growth as they approached the boundary between

---

[3] The FCC also rejected Sorenson's proposed rate because it was based on unreliable projected costs.

[4] Under the new plan, the rate for emergent providers is $5.29 per minute. Tier I compensates providers at $4.82 per minute for up to 1 million minutes per month; Tier II pays $3.97 for minutes 1 to 2.5 million per month; and Tier III pays $3.21 for minutes over 2.5 million per month. The Tier III rates will gradually decline from $3.21 in 2017 down to $2.63 in 2020. As of now, only Sorenson provides enough minutes to receive any compensation under Tier III. But Sorenson still fares well under this scheme. The FCC found that the lowest Tier III rate ($2.63 per minute in 2020) "is higher than the average allowable expenses per minute for [Sorenson]." *Id.* at 5923. The agency also found that, under its new tiered-rate structure, Sorenson "is likely to continue earning higher per-minute operating margins than any of its competitors." *Id.* at 5919 n.167.

tiers. The new compensation rates are effective from 2017 through 2021. *See id.* at 5916-24.

The FCC emphasized that it would "revisit the VRS compensation rate structure" in four years. Report and Order and Order FCC-17-86A1, J.A. 23. Moreover, the agency predicted that full implementation of its structural reforms, the collection and publication of service-quality metrics, and the agency's new attention to idiosyncratic anticompetitive features in the VRS market could enable more effective competition among VRS providers in the future.

\* \* \*

Two parties petition for review of the 2017 Order, Sorenson and the VRSCA. Sorenson, as already noted, is the dominant provider in the VRS market. VRSCA is not a provider and describes itself as an unincorporated association that creates "an information forum" for VRS users with a primary purpose of integrating VRS into daily life. VRSCA Br. iii. VRSCA notes, "All VRS users may participate in the organization at no cost and are encouraged to sign up for email updates," and over 10,000 individuals have signed up. *Id.* VRSCA also informed us that it "receives funding" from Sorenson. *Id.* at iv. We asked VRSCA to provide supplemental briefing to clarify its relationship with Sorenson, and VRSCA confirmed that Sorenson "provides 100% of VRSCA's financial support." VRSCA Suppl. Br. 2.

II

Sorenson and VRSCA separately seek review of the FCC's final rate order. Both parties filed timely petitions for review, and we have jurisdiction under 47 U.S.C. § 402(a) and 28

U.S.C. §§ 2342(1), 2344. As discussed below, Sorenson has standing to seek review but VRSCA does not.

Under the Administrative Procedure Act (APA), we will set aside FCC actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicles Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because "agency ratemaking is far from an exact science and involves policy determinations in which the agency is acknowledged to have expertise, courts are particularly deferential when reviewing ratemaking orders." *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999) (citations and internal quotation marks omitted).

For questions of statutory interpretation, we use the familiar *Chevron* framework. We first ask whether Congress has "'directly spoken to the precise question at issue,' *Chevron USA Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), and if so, whether it has unambiguously foreclosed the agency's statutory interpretation." *Catawba County v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009). If the agency's interpretation is not unambiguously foreclosed by the statute, we defer to its interpretation "so long as it is reasonable." *Id.*

III

VRSCA has failed to establish constitutional standing. The "irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered an injury-in-fact, (2) there must be a causal connection between the injury and the conduct challenged, and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

VRSCA claims it has "associational standing" to challenge the FCC's 2017 Order. An association has standing on behalf of its members when: "(1) 'its members would otherwise have standing to sue in their own right;' (2) 'the interests it seeks to protect are germane to the organization's purpose;' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Thus, to meet the first requirement for associational standing, VRSCA must show that at least one of its members was injured in fact, the injury was caused by the 2017 Order, and the court can redress the injury. Moreover, "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured. Rather, the petitioner must specifically identify members who have suffered the requisite harm." *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011) (citations and internal quotation marks omitted).

In its opening brief, VRSCA failed to identify a specific member who had been injured by the 2017 Order. Instead, VRSCA broadly asserted that "any individual member of VRSCA . . . would have standing to sue in his or her own right as a VRS user." VRSCA Br. 8. After the FCC challenged VRSCA's standing, VRSCA stated in its reply brief that its director, Sharon Hayes, is a member who is deaf and uses VRS. *See* VRSCA Reply Br. 2-6.

VRSCA's argument for standing fails to comply with our procedural requirements set out in *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). *Sierra Club* distilled certain procedural ground rules for petitioners to establish standing to challenge an agency decision. Petitioners must substantiate their claim of standing "with the manner and

degree of evidence required at the successive stages of the litigation." *Id.* at 899 (quoting *Lujan*, 504 U.S. at 561). When a petitioner seeks direct judicial review of an agency decision, the court examines the petitioner's standing as it would at summary judgment—in other words, "the petitioner must either identify in th[e] record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence to the court of appeals." *Id.* Frequently, this requirement poses no problem because in "many if not most cases the petitioner's standing to seek review of administrative action is self-evident." *Id.* However, when a petitioner's standing is not "clear" or "self-evident" on the face of its petition, the petitioner is required to address its standing in its opening brief. *Id.* at 900; *see also Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 851 F.3d 1324, 1327 (D.C. Cir. 2017) (per curiam).

VRSCA's standing was far from self-evident in its initial filings; to the contrary, VRSCA's standing presented multiple, interrelated difficulties that it entirely failed to address. For example, it is unclear if VRSCA is the sort of organization that would qualify as a "membership association" for purposes of our standing analysis. *Am. Legal Found. v. FCC*, 808 F.2d 84, 89-90 (D.C. Cir. 1987). Even in light of its supplemental briefing after oral argument, VRSCA appears to lack many of the "indicia of a traditional membership" association, such as a membership that finances the association's activities or plays a role in selecting its leadership. *See id.* Its reply brief and post-argument submission instead invoke as "members" the passive subscribers to its e-mail list and individuals who "follow" the group's Facebook page. *But see Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435-36 (D.C. Cir. 2002) (holding that a magazine's readers and subscribers were not its members for purposes of associational standing). And we now are told that Sorenson "provides 100% of VRSCA's financial support,"

VRSCA Suppl. Br. 2, which casts further doubt on VRSCA's status as a constitutionally viable representative of the interests of its "members."[5]

VRSCA's standing is further complicated by numerous unanswered questions about the nature of the injury to its director Sharon Hayes, the only individual "member" it now identifies as having standing in her own right. Various documents in the administrative record allowed us to discern that Hayes is personally deaf, a user of VRS, and the director of VRSCA. But the association made no argument that the rates set in the 2017 Order adversely affected her service, costs, or access to needed equipment, or that the rates injured her in any other individualized way.

In sum, VRSCA's opening brief fell too short of the mark. It failed to identify any of its members or the harm they suffered, failed to disclose that it is fully funded by Sorenson, and offered only conclusory and general assertions about the nature of the association, untethered from evidence. Given the multiple potential hurdles VRSCA faced, it was unreasonable to assume that its standing was "self-evident." By failing to bring forward the facts necessary to address all of this, VRSCA did not satisfy the requirements set out in *Sierra Club*. We therefore conclude that VRSCA did not carry its burden to establish standing.

---

[5] VRSCA's complete financial dependence on Sorenson raises several concerns, not least of which is that VRSCA today advances the precise argument that Sorenson is collaterally estopped from making. *See Sorenson II*, 765 F.3d at 43-46 (holding that Sorenson is barred under issue preclusion from challenging the FCC's determination on compensation for VRS equipment).

18

IV

A

Turning to Sorenson's petition, we must resolve two threshold questions pertaining to standing and claim preclusion.

*First*, amici claim Sorenson lacks standing to challenge the 2017 Order because it was not injured by that order. That is so, amici argue, because it is undisputed that the 2017 Order's rate adequately compensates Sorenson for its statutorily allowable costs; *i.e.*, Sorenson doesn't claim it is getting shortchanged by the new rate. Nor does Sorenson specify how it was otherwise injured by the order. We consider these objections, mindful of "our independent obligation to be sure we have jurisdiction." *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002).

We conclude Sorenson has standing under the competitor standing doctrine. That doctrine recognizes that economic actors "'suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). Because increased competition almost surely injures economic actors, they "need not wait" until they are competitively hurt "before challenging the regulatory . . . governmental decision that increases competition." *Id.* In short, "the basic requirement" is that "the complainant show an actual or imminent increase in competition [that] will almost certainly cause an injury in fact." *Id.* at 73.

Sorenson has competitor standing to challenge the FCC's 2017 Order based on anticipated harm to its dominant position in the VRS market. The entire purpose of the tiered-rate structure is to promote competition and enable smaller VRS providers to expand their shares of that market. At least some of that expansion would inevitably come at the expense of Sorenson, which controls 80% of the VRS market. This intended effect of the 2017 Order provides sufficient evidence of an "actual or imminent" increase in competition. Sorenson's competitor-based standing is "clear" and "self-evident" on the face of its petition, and for that reason Sorenson did not need to provide a lengthy explanation of its standing. *See Sierra Club*, 292 F.3d at 899-900.

*Second*, the FCC briefly argues that Sorenson's challenge to the tiered-rate structure is barred by claim preclusion. Claim preclusion, also called res judicata, "bars a party from re-litigating a claim that was or should have been asserted in a prior action." *Hurd v. District of Columbia*, 864 F.3d 671, 679 (D.C. Cir. 2017). Under this doctrine, "a judgment on the merits in a prior suit bars a second suit involving identical parties . . . based on the same cause of action." *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004). As we have noted, our claim-preclusion case law uses interchangeably the terms "claim" and "cause of action." *See Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78 n.3 (D.C. Cir. 1997). For purposes of claim preclusion, "it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." *Page v. United States,* 729 F.2d 818, 820 (D.C. Cir. 1984) (citation and internal quotation marks omitted).

The FCC argues Sorenson's claim is precluded because the company has challenged the FCC's VRS rates twice before while similar tier structures were in place, but Sorenson failed

to contest those tiers either time. In neither *Sorenson I* (challenging the 2010 Interim Rate Order) nor *Sorenson II* (challenging the 2013 Order) did the company argue that § 225 prohibits tiered rates. And since claim preclusion bars a party from re-litigating arguments it could have raised in a prior proceeding, the FCC argues that Sorenson may not challenge the tiered-rate structure for the first time now.

Sorenson is not barred from challenging the tiered-rate structure because of its prior lawsuits in *Sorenson I* and *Sorenson II*. We have previously explained that "rate orders are generally not *res judicata* because '[e]very rate order made may be superseded by another.'" *Norfolk & W. Ry. Co. v. United States*, 768 F.2d 373, 378 (D.C. Cir. 1985) (emphasis omitted) (quoting *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 445 (1930)). Claim preclusion has a limited application in the ratemaking context because new rates and new rate orders are almost always based on new facts and circumstances that were not present at the time of the earlier judgment, and so cannot be precluded by that earlier claim. *See Stanton*, 127 F.3d at 78 ("[I]f the plaintiff alleges a combination in restraint of trade, a new cause of action accrues each time it operates against him, and previous judgments do not bar repeated challenges. . . . Similarly, each successive enforcement of a statute . . . creates a new cause of action." (citations and internal quotation marks omitted)); *see also Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1290 (D.C. Cir. 2000); *W. Coal Traffic League v. ICC*, 735 F.2d 1408, 1411 (D.C. Cir. 1984). Nor does claim preclusion bar a subsequent suit based on events and circumstances that post-date and materially differ from those previously at issue. *See Stanton*, 127 F.3d at 79. Today Sorenson challenges the FCC's 2017 Order, which modified the agency's ratemaking methodology and its actual rates based on new information gleaned from the agency's experience in the years since issuing

the 2013 Order. This new order, based on a materially changed record, gave rise to a new claim, and therefore Sorenson's petition is not barred by claim preclusion.

B

1

On the merits, we first address Sorenson's main argument that the 2017 Order's retention of tiered rates is incompatible with § 225's efficiency mandate. The parties agree that the tiered-rate structure is designed to promote competition by preserving multiple VRS providers in the market. They disagree over whether that is a permissible consideration under the statute. Sorenson argues that § 225 requires the VRS rate to be set in the "most efficient manner," and that the FCC itself acknowledged in its orders from 2013 and 2017 that a tiered-rate structure is inefficient. The FCC claims the tiered-rate structure is consistent with § 225's efficiency mandate because the agency must consider the long-term efficiency of the VRS market—including achieving the best quality of service for the cost—not just short-term savings. And if the FCC failed to preserve more than one VRS provider in the market, the market would devolve into a monopoly and its efficiency would be undermined.

We begin with *Chevron*'s first step and ask whether the FCC's interpretation of the "precise question at issue" is "unambiguously foreclosed" by the statute. *Catawba County*, 571 F.3d at 35 (internal quotation marks omitted). Here, that means we ask if § 225 unambiguously forecloses the FCC's interpretation of the efficiency mandate, which seeks to promote the VRS market's long-term efficiency by preventing a monopoly.

In § 225, Congress chiefly tasked the FCC with ensuring the provision of communications services for people who are deaf or speech-impaired in a manner that is "functionally equivalent" to services available for hearing people. 47 U.S.C. § 225(a)(3). In carrying out this primary objective, Congress instructed the FCC to balance several different factors: the FCC must regulate the recovery of "costs caused by" the services, *id.* § 225(d)(3)(B); it must implement the program in a way that encourages "the use of existing technology" and does not "discourage or impair the development of improved technology," *id.* § 225(d)(2); and the FCC must ensure those services are "available, to the extent possible and in the most efficient manner," *id.* § 225(b)(1). Section 225 does not instruct the FCC how to prioritize these various factors, nor does it define them.

Because § 225 does not define "efficient," we give the term its ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Sorenson agrees, settling on the definition: "to produce the desired result without waste." Sorenson Br. 24 (citing *The American Heritage Dictionary of English Language* (5th ed. 2016)). This definition, however, does not "unambiguously foreclose" the FCC's interpretation. The ordinary meaning of "efficiency" does not indicate whether the FCC's mandate to avoid waste must focus exclusively on achieving the lowest cost for a given set of services in the short term or whether, instead, the agency may also consider projected longer-term costs and the effects of its compensation choices on the quality of services users receive. Maximizing cost savings today could diminish the market's efficiency—cost relative to service quality—tomorrow, and nothing in the ordinary meaning of the word prohibits the FCC from considering those downstream implications. Nor does the word dictate *how* the agency may promote the long-term health of the VRS market, whether it be through preserving multiple

market participants or using a tiered-rate structure to do so. Because the efficiency mandate does not unambiguously foreclose the FCC from considering the VRS market's long-term efficiency, nor dictate how the agency may pursue that end, the FCC's interpretation passes the first step of *Chevron*.

At *Chevron*'s second step, we ask whether the FCC's interpretation is reasonable. *Catawba County*, 571 F.3d at 35. We conclude that it is. Indeed, it would be hard to argue otherwise. How could it be *unreasonable* for the FCC to interpret its efficiency mandate to include consideration of the VRS market's long-term efficiency? Not even Sorenson argues that. Instead, Sorenson claims that the FCC's chosen *technique* for promoting long-term efficiency—preserving multiple market participants—is an unreasonable method of pursuing efficiency. Embedded within this argument, Sorenson also challenges as unreasonable the FCC's method for preserving multiple market participants: a tiered-rate structure. We find these challenges unpersuasive, and we defer to the FCC's "reasoned explanation for why it chose [its] interpretation." *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

*First*, Sorenson argues that any effort at preserving multiple VRS providers in the market is an impermissible "extra-statutory consideration." Sorenson Br. 28. According to Sorenson, competition cannot advance § 225's efficiency mandate because "the VRS market is not a true competitive market in which competition among providers can drive prices down and encourage providers to seek greater efficiencies." *Id.* In other words, because VRS providers don't set the VRS rates, competition is irrelevant. Although Sorenson never quite says so, it effectively argues that a monopoly—with itself as the monopolist—will be the "most efficient manner" of regulating the VRS market.

Even given the unique features of the VRS market, preventing a monopoly is a reasonable way to promote the efficiency of VRS. As the FCC noted, efficient service is not just about cost but also quality. *See* 2017 Order, 32 FCC Rcd. at 5909 (measuring efficiency requires "comparing the overall expenditures from the TRS Fund . . . with the overall results achieved by such expenditures" (emphasis omitted)). So even though competition in the VRS market may not necessarily "drive prices down," Sorenson Br. 28, it may still promote efficiency by "encourag[ing] the lowest-cost provider to maintain higher standards of service quality," 2017 Order, 32 FCC Rcd. at 5907. In other words, competition promotes efficiency by preventing subpar service from a monopolist who has no fear of losing customers; *i.e.*, it promotes compliance with the service quality required by the mandatory minimum standards.

Preventing a monopoly promotes efficiency in other ways as well. As the FCC explained, the VRS market has gone through many changes over the past several decades, and the agency needs to retain "flexibility to consider other approaches that may improve efficiency." *Id.* at 5910. For instance, "one option the Commission may want to consider in the future is a reverse auction, in which multiple providers bid for offering service at the most efficient levels." *Id.* But as the FCC noted, that option won't be possible "if all providers except one have been driven out of the market." *Id.* Because the FCC plans to experiment with more efficient rate structures, and because those experiments will require multiple providers, the agency reasonably concluded that preserving market participants promotes long-term efficiency.

*Second*, Sorenson argues that the FCC cannot retain a tiered-rate structure because the 2013 Order conclusively

established that such a rate structure is inefficient. But Sorenson overlooks that two propositions can be true at once: (1) a tiered-rate structure may not be maximally efficient in terms of minimizing spending in the short term *and* (2) the tiered-rate structure may be necessary for the long-term efficiency of the market because it preserves multiple market participants. And that is precisely what the FCC's orders say.

In the 2013 Order, the FCC explained that the tiered-rate structure was not optimally efficient, and the agency hoped to move to a single rate. 28 FCC Rcd. 8618. The agency predicted that after implementation of its structural reforms, this transition would be feasible without "unnecessarily constricting the service choices available to VRS consumers" by driving smaller providers out of the market. *Id.* at 8699. The FCC concluded it was "worth tolerating some degree of additional inefficiency in the short term, in order to maximize the opportunity for successful participation of multiple efficient providers in the future, in the more competition friendly environment that we expect to result from our structural reforms." *Id.* When these structural reforms failed or were delayed, however, the agency concluded in its 2017 Order that long-term efficiency considerations justified retention of the admittedly inefficient tiered-rate structure. 32 FCC Rcd. at 5910. Whatever inefficiencies it may introduce in the short term, the tiered-rate structure is essential to prevent the greater long-term inefficiency that would result from a monopoly. None of this amounts to an unreasonable interpretation of § 225's efficiency mandate.

*Third*, it is undisputed that no party proposed a more efficient rate structure than the one adopted by the FCC. Sorenson proposed a single rate set at "no lower than $3.73 per minute," *id.* at 5923, but that would have been more costly to the TRS Fund than the tiered-rate structure adopted by the

FCC, *id.* at 5909. Sorenson now argues that the FCC could have adopted a lower single rate, but no party made such a proposal to the agency, nor does it seem likely that any of Sorenson's competitors could have survived under a lower rate. Therefore, even if such a rate had been proposed, the FCC could still have reasonably rejected it for threatening the preservation of multiple competitors.

In sum, the FCC interprets its efficiency mandate to permit consideration of both short- and long-term efficiency, including efficiency-promoting objectives other than the lowest possible price, such as service competition. To promote the efficiency of the VRS market, the agency retained its tiered-rate system to prevent the market from devolving into a monopoly. We conclude that this interpretation was reasonable.

2

Sorenson also attacks the 2017 Order with several arguments that it styles as arbitrary-and-capricious challenges under the APA. Sorenson claims the agency's retention of the tiered-rate structure was arbitrary and capricious because (1) the FCC reversed without explanation its prior position that the tiered-rate system was inefficient; (2) there is no record evidence that smaller providers will become efficient in the future; (3) the design of the tiers will entrench the inefficiencies of smaller providers and harm Sorenson; and (4) the agency permitted two VRS providers that merged to be compensated as separate entities under the tiers.

If our review in this section seems similar to the *Chevron* analysis in Part IV.B.1, that's because it is. Our "inquiry at the second step of *Chevron*, *i.e.*, whether an ambiguous statute has been interpreted reasonably, overlaps with the [APA's]

arbitrary and capricious standard." *Chamber of Commerce of the U.S. v. FEC*, 76 F.3d 1234, 1235 (D.C. Cir. 1996) (citing *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 726-27 (D.C. Cir. 1994)); *see also Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000). Arbitrary-and-capricious review is generally deferential, but it is "particularly deferential" in cases such as this, which "implicate competing policy choices, technical expertise, and predictive market judgments." *Ad Hoc Telecomm. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (citations omitted). When reviewing an agency's predictive judgment under these circumstances, we "require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). With this especially deferential standard in mind, we address Sorenson's three arguments in turn.

*First*, Sorenson argues that it was arbitrary and capricious for the FCC to retain the tiered-rate structure because its 2013 Order took the position that tiered rates were inefficient and planned to eliminate them; however, its 2017 Order changed course without explanation. This mischaracterizes both orders. As explained above, the 2013 Order used tentative language when discussing its plan to eliminate the tiered-rate structure. The FCC said that it hoped its structural reforms, once implemented, would eliminate the need for a tiered-rate system. *See, e.g.*, 2013 Order, 28 FCC Rcd. at 8698-99 ("[W]e anticipate that the complete elimination of rate tiers . . . will be able to coincide with the implementation of VRS structural reforms."). The agency's decision to eliminate tiers was contingent upon realizing certain hoped-for outcomes, namely growth by the smaller VRS providers. Because those predictions went unrealized, the 2017 Order explained that the tiers remained necessary.

Under the APA, an agency is free to change its position if it sets forth reasonable grounds for doing so. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). Here, the FCC did not change its position because its plan to eliminate the tiers was conditioned on the successful implementation of its structural reforms. But even if the FCC did "change its position" by choosing to retain the tiers, it provided reasonable grounds for doing so. *See, e.g.*, 2017 Order, 32 FCC Rcd. at 5905-07 (detailing why the tiers remained necessary to preserve competition due to the unsuccessful or delayed implementation of the structural reforms); 2017 FNPRM, 32 FCC Rcd. at 2469-74 (same).

*Second*, Sorenson argues that there is no evidence in the record that smaller providers will be able to grow over the course of the next four years. To the contrary, the FCC has explained that the continued implementation of VRS interoperability, portability, and service quality reforms "may offer greater opportunities for providers to compete more effectively with one another." 2017 Order, 32 FCC Rcd. at 5913. The agency predicted that the full implementation of the structural reforms (particularly, interoperability and equipment portability), the collection and publication of service-quality metrics, and the agency's new attention to idiosyncratic anticompetitive features in the VRS market may enable more effective competition between multiple VRS providers. We afford "substantial deference" to that type of predictive judgment by an agency acting in its area of expertise. *Nat'l Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 182 (2015).[6]

---

[6] Sorenson argues that interoperability barriers to competition have already been resolved; however, even Sorenson's own expert acknowledges that certain interoperability issues persist. *See* 2017 Order, 32 FCC Rcd. at 5905 n.83.

*Third*, Sorenson argues that the design of the tiered-rate structure will "entrench smaller providers' existing inefficiencies" by diminishing their incentive to grow, and it also irrationally penalizes Sorenson by retaining a glide path only for the Tier III rates—a rate tier that applies only to Sorenson. *See supra* note 4. Neither claim prevails under our deferential review. As the 2017 Order explained, because there is a set rate within each tier, VRS providers have an incentive to decrease costs so they can maximize profits. *See* 32 FCC Rcd. at 5911. Moreover, contrary to Sorenson's claim, the agency found no evidence that smaller providers intentionally slowed their growth as they approached a tier boundary at which they would start receiving a lower per-minute rate. *Id.* at 5910. And despite Sorenson's complaint, there's little to suggest the 2017 Order irrationally penalizes Sorenson by retaining the glide path for Tier III. The FCC found that "Sorenson is likely to continue earning higher per-minute operating margins than any of its competitors," *id.* at 5919 n.167, and Sorenson's actual costs fall below the Tier III rate, even after the glide path reaches its lowest level, *see supra* note 4. Sorenson does not contest these facts, and there is no basis to conclude that the FCC acted out-of-bounds in giving Sorenson extra time to adjust to a rate that reflects its actual cost-of-service.

*Fourth*, Sorenson argues that the FCC acted arbitrarily by allowing two recently merged VRS providers to count their VRS service minutes separately until the companies fully merge their operations. But far from arbitrary, the agency's decision to give these two companies three years before counting their minutes jointly was based on a consent decree that affords the two companies three years to merge their operations. Waiting until the companies actually integrate before combining their service minutes is reasonable.

The tiered-rate structure in the 2017 Order "represents the agency's expert assessment, and we examine 'not whether the FCC's economic conclusions are correct or are the ones that we would reach on our own, but only whether they are reasonable.'" *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (quoting *In re Core Commc'ns, Inc.*, 455 F.3d 267, 279 (D.C. Cir. 2006)). We conclude that they are. Though the FCC acted reasonably in this case, we note that the agency has an ongoing, independent obligation to satisfy its statutory mandate. Given the agency's longstanding concern with the subsidization of high-cost providers, a failure to consider all possible solutions to this problem could well become arbitrary at some point.

V

For the foregoing reasons, we dismiss VRSCA's petition for lack of standing and deny Sorenson's petition for review.

*So ordered.*